GUS STATHIS, Plaintiff-Appellant and Cross-Appellee, v. GELDERMANN, INC., *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division)   No. 1—96—0971

Opinion filed March 13, 1998.—Rehearing denied April 2, 1998.

Edward T. Joyce & Associates, P.C., of Chicago (Edward T. Joyce and Alexander T. Moore, of counsel), for appellant.

Kevin M. Flynn & Associates (Kevin M. Flynn, of counsel), and Robert A. Chapman, P.C. (Robert A. Chapman, of counsel), both of Chicago, for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Gus Stathis (Gus), brought this action against defendants after they entered into an agreement with his son, James Stathis (James), and took over the business and operations of Star Clearing Partnership (SCP), in which Gus possessed a controlling interest. The circuit court granted summary judgment for defendants, but in *Stathis v. Geldermann, Inc.*, 258 Ill. App. 3d 690, 698-701, 630 N.E.2d 926 (1994) (*Stathis I*), we reversed and remanded, holding that genuine issues of material fact existed with respect to whether James was authorized by Gus to execute the agreement with defendants. On remand, the case was tried; the court directed verdicts for defendants on two counts, and the jury entered verdicts in favor of defendants on the remaining two law counts. The court entered judgment for Gus on his unjust enrichment claim and awarded him $176,050.

Much of the pertinent evidence has been set forth in our first opinion (258 Ill. App. 3d at 691-96) and will be repeated only where necessary for an understanding of the instant opinion.

On appeal, Gus maintains that he is entitled to judgment notwithstanding the verdict or, in the alternative, a new trial, based upon the cumulative effect of several assertedly prejudicial erroneous evidentiary rulings which denied him a fair trial. On cross-appeal, defendants argue that the judgment in favor of Gus on the unjust enrichment claim was against the manifest weight of the evidence.

In April 1986, James met with vice-president Dennis Zarr, of Geldermann, Inc. (Geldermann), at the time one of the world's five largest futures clearing firms, to discuss forming some type of relationship between Geldermann and SCP. Geldermann wanted to expand its business, and "enter the non-equity option (NEO) clearing business for institutional customer transactions, to develop a floor presence on the [Chicago Board of Options Exchange (CBOE)], and to actively engage in the clearing of market makers on the Exchange." Geldermann planned to operate this business through its wholly owned subsidiary, Geldermann Securities, Inc. (GSI), originally named Heinold Securities, Inc. (Heinold), until it was purchased by Geldermann and subsequently renamed GSI on February 1, 1987. Geldermann sought a relationship with a company that already was a member of and clearing trades on the CBOE. On December 24, 1986, James, Geldermann and GSI executed an agreement (December 1986 agreement) in which GSI would operate SCP's business and

employ its workers, and James would work for GSI and be responsible for all operations relating to clearing services and market makers.

Between February and December 1987, Gus received a series of payments from SCP totalling approximately $630,000. After failing to receive repayment of the remaining $460,000 loaned to the partnership, Gus filed a complaint against Geldermann, GSI, SCP, James, and others, stating claims for conversion of the capital and profits of SCP, and diversion of corporate opportunity, but dismissed all parties, except for Geldermann and GSI.

After this court reversed the circuit court's order granting summary judgment for defendants and remanded the case for trial, Gus filed a five-count amended complaint, alleging that defendants converted his interest in SCP; conspired to divert a business opportunity; conspired to defraud him; and committed constructive fraud. Count V purported to state a claim for unjust enrichment, alleging that defendants took over SCP without sufficient compensation to SCP or Gus.

At trial, Gus, a retired real estate broker, testified that in 1985, James asked him to invest in a new clearing firm on the CBOE. They formed a partnership with John F. Martorello, Gus providing the capital, and James and Martorello running the business and providing $10,000 each in start-up costs.[1]

Gus first heard of Geldermann in April 1986, when James introduced him to Zarr. James later informed Gus that Geldermann was interested in purchasing an interest in the partnership. At James' request, Gus forwarded a letter to James, which permitted James to negotiate a deal with Geldermann "on behalf of my interest," further stating that "whatever deal you may or may not conclude, I will abide by it and I am obligated to accept."

In the summer and fall of 1986, Gus saw Geldermann employees at the partnership's offices. He did not converse with or attend any meetings with them. In September, he asked James and Patricia Pokuta, then SCP's office manager, about the discussions with Geldermann. In December 1986, James asked Gus if he would be happy with a return of the money he loaned the partnership plus $100,000,

---

[1]Corporate partners, SCI and Scorpio, were established by Gus' attorney to protect him from liability. SCI owned 66.67% of the partnership, and Scorpio owned 33.319%. The partnership agreement provided that only SCI and Scorpio would be voting partners and, in the event of a tie vote, Scorpio's vote would be controlling and binding. Martorello and Gus were the sole shareholders of SCI, and James and Gus were the sole shareholders of Scorpio, Gus being the majority shareholder in both.

after Geldermann paid him $3 million for the partnership. Gus approved. On Christmas Eve 1986, when Gus saw the contract James signed with Geldermann for the first time, he became very angry and said the agreement was not worth the paper it was written on. Gus returned to the SCP's offices on December 28, where he saw that Geldermann already had taken over. Gus took files, ledgers, and checkbooks from the office, portions of which he later returned, and gave them to his attorney to review. Gus expected to see any final deal with Geldermann before it was signed and to consult with his attorney before approving the deal.[2]

Zarr, called as a witness by Gus, testified substantially as set forth in *Stathis I*. He also testified that James repeatedly told Zarr that he owned SCP in its expansion plans. Zarr believed the partnership's back office and floor expertise would be a major asset for Geldermann. In July 1986, Zarr encouraged Geldermann's president and chief executive officer, Kevin Mack, to consider SCP. By August 1986, when Zarr attended a lunch meeting with Mack, James, and Martorello, SCP was the primary candidate for a clearing relationship with Geldermann. Zarr wrote in his notes at a September meeting that Geldermann "[m]ust replace his father's capital of $980,000 before deal is signed. This is very important and nonnegotiable." Zarr told James that Geldermann could generate at least three million contracts for SCP.[3]

Ned Bennett, also called as a witness by Gus, testified that he worked for Heinold and then GSI and was president and chief executive officer of GSI. In 1986, Bennett was responsible for Geldermann's

[2]Gus never informed anyone from Geldermann of his rights in SCP. He also did not ask to participate in the negotiations with Geldermann. Gus told James in May 1986 that if he was repaid the money he invested plus $75,000, he would "walk away" from SCP. No one from Geldermann told Gus that they had made such an offer to James. In his deposition testimony, Gus said that as long as he received his investment back, he didn't care if SCP was sold, traded, or merged, and if he had received back the money he invested and loaned, plus the $100,000, "[w]e wouldn't be here today."

[3]James' expertise and connections enabled Geldermann to obtain memberships with both CBOE and OCC. James never told Zarr that the partnership had lost one of its biggest customers and 75% of its revenue after June 1986. With the exception of the September 1986 meeting, Zarr was not involved in the negotiations with SCP. James told Zarr that his father asked him on a daily basis when he was going to get his money back and had threatened to pull out his capital, which was beginning to affect SCP's market makers. Zarr never knew or cared that Gus was a partner in SCP. Geldermann expected to earn $6 million in profits from the agreement with James.

efforts to become a member of or gain a presence on the CBOE and the Options Clearing Corporation (OCC). He reported to Salvatore Caputo, who, in September 1986, introduced him to James and Martorello. Caputo wanted to form a business relationship with SCP. Mack and Caputo told Bennett they wanted to be working on the CBOE by January 1, 1987.

Heinold officials stated in the application for OCC membership that the company planned to rely upon the personnel, operations, and organization of SCP for clearing market-makers, describing their relationship as a "marriage" between the two firms, according to Bennett. Geldermann became a clearing member on OCC. On December 5, 19 days before the agreement between Geldermann and SCP was executed, Geldermann sent two SCP employees to a Heinold meeting with OCC. Although Geldermann had not yet entered into an agreement with SCP, the representations made to OCC bound Geldermann to some type of relationship with SCP and James. On December 26, two days after the agreement between Geldermann and SCP was signed, the name on the door to the partnership's offices was changed to Heinold, and Heinold employees moved into SCP's offices. In addition, all market-makers who were clearing through SCP began clearing through Geldermann, who took over SCP's obligations. Geldermann also made available to James $10 million in capital, to be invested in the business.[4]

Mack, called by Gus, testified essentially as set forth in *Stathis I*. Additionally, Mack asserted that he ordered the preparation of a letter of intent to outline the SCP-Geldermann relationship. Eldon Ham, SCP's attorney, thereafter drafted the December 1986 agreement, with Geldermann's general counsel making some revisions. Geldermann expected to earn as much as $7 million at the end of SCP's first year of operation with Geldermann. James told Mack that he had made arrangements to transfer SCP's new and existing market-maker customers to Geldermann, induced by Geldermann's offer to James of 50% of the profits earned by the SCP division, and

[4]Bennett believed that James owned SCP, and Gus simply was an investor who wanted his money back. Bennett told James that Geldermann would not pay Gus $100,000, but Geldermann did replace his capital investment, and satisfied more than $80,000 worth of debts owed. Ham retained control of SCP's bank accounts, and Pokuta assisted Ham in liquidating SCP's assets so that Gus could be repaid. After the acquisition of SCP, Bennett ran into Gus at SCP's offices; Gus told him that "I believe my Jimmy will do a very good job for Geldermann," and "I'm very relieved, because now I can have my money back." Both CBOE and OCC approved the transfer of SCP's market-maker accounts to Geldermann.

guaranteed to pay the division $3.75 million, minus expenses. James, Martorello and the other partnership employees became Geldermann employees.

Patricia Pokuta, called as a witness by Gus, testified that she worked for SCP as its operations manager from July 1985 until December 24, 1986, when she began working for Geldermann. She gave Zarr SCP's financial statements in August 1986 after James told her he wanted Geldermann to acquire SCP. Everyone who worked at SCP became Geldermann employees after December 24, 1986. On December 30, she wrote OCC requesting that it transfer all market-maker positions to Heinold, which enabled SCP to receive money from Geldermann so that it could release its existing capital and be used to repay Gus. Geldermann overpaid SCP for the transfers by $71,000, which also was sent to Gus. He never expressed any dissatisfaction with the December 1986 agreement, asking only for the return of his money, and accepted checks from Pokuta without complaint.

Caputo testified as a witness in Gus' case. In addition to his testimony described in *Stathis I*, he stated that James told him SCP was a partnership consisting of him and Martorello. Caputo began negotiating with James, and they reached a verbal agreement by September, in which James would leave the partnership and join a Geldermann profits center, and SCP's business would be brought into Geldermann, by January 1, 1987.

Denise Hagerty, formerly Geldermann's comptroller, testified about financial computations she prepared in November 1986, analyzing projected expenses and profits in the proposed transaction with SCP. Hagerty was told that James had to pay his father back by December 31. No one at Geldermann went to SCP to examine their books and records before forming the projections.

James Stathis, called as a witness by Gus, testified in essence as set forth in *Stathis I*. James further testified that he built up SCP in order to sell it. Geldermann negotiated with him in order to acquire his license, personnel, equipment, and office facilities. After the December 1986 agreement was signed, Geldermann took over SCP's offices. James decided to sell SCP to Geldermann so he could repay Gus' investment,[5] and because he expected to make a lot of money from the transaction, including a $3.75 million guarantee under the

---

[5]James received several letters from his father threatening to remove his capital, but he did not take those threats seriously. James did not speak with Gus about the details of the negotiations with Geldermann until after he signed the December 1986 agreement. James told Mack, Caputo, and Zarr

contract with Geldermann, to be paid without regard to the costs of running SCP. He did not receive that money. The $3.75 million represented the value of SCP's business and assets. James showed the December 1986 agreement to his father the day after he signed it. Gus told him it wasn't worth the paper it was written on. In previous testimony, James stated that his father also said, "fine, when do I get my money out?"

James managed the SCP division of GSI for approximately 14 months. The division earned between $1.4 and $1.8 million. James terminated his relationship with Geldermann in February 1988 after the company stopped paying him money, which he believed to be in breach of their agreement. He received a total of $719,000 from Geldermann, including a $359,000 payment he was awarded through arbitration. SCP lost more than $200,000 in the last six months of 1986. James allocated a large amount of the loss suffered by SCP to Gus in proportion to the amount of his investment in the partnership. Geldermann was supposed to repay Gus, but James acknowledged that, in previous testimony, he stated that he repaid his father from a bank loan one day before he signed the December 1986 agreement with Geldermann.

Two expert witnesses testified for Gus. Lawrence Kaplan estimated the fair market value of the SCP assets acquired by Geldermann on December 24, 1986, to range from $2,305,000 to $8,782,000. Included as assets in this estimate were the partnership's clearing number, personnel, infrastructure, experience, and goodwill. Kaplan also based his estimate on financial projections prepared by Hagerty for Geldermann, and the December 1986 agreement, believing that it provided a guaranteed payment of $3.75 million, of which James was entitled to half, and $10 million of capital that was interest-free. Martin Cohen testified that a large futures commission merchant would have paid a premium to acquire the key assets and personnel of SCP in December 1986, because acquiring an existing organization would give a company immediate access into the market-maker field, the company would save a lot of time, and with an existing customer base, the company could immediately begin to earn profits.

At the close of Gus' case, the circuit court directed verdicts in favor of defendants on the conspiracy counts, finding that they merged into the constructive fraud and conversion counts. The court denied defendants' motion for a directed verdict on the remaining three counts in Gus' complaint—for constructive fraud, conversion, and unjust enrichment.

---

that his father controlled the company and wanted only the return of his investment plus $100,000, and Mack said, "no problem."

John Hopkins testified for defendants that in November 1986, he was hired by SCP in anticipation of the December 1986 agreement. Hopkins believed that Gus' connection to SCP was only as James' father and the lessor of the CBOE seats. In February or March 1987, Hopkins saw Gus come into the offices with his wife.

Ham testified for defendants that he represented SCP from 1986 to the beginning of 1987. He knew of Gus' displeasure with the way James managed SCP and heard Gus threaten to remove his capital. He prepared the first draft of the December 1986 agreement, which marked the beginning of an exchange of drafts between him, James and Geldermann. None of the drafts contained any language requiring Geldermann to pay Gus or SCP any money, and he never heard such a requirement discussed. Ham believed that, as a result of the agreement, James would become a Geldermann employee and SCP would be liquidated.

Ham discussed the Geldermann negotiations with Gus, who knew about the proposed agreement with Geldermann. Gus did not object to the agreement and was concerned only with whether the agreement would bring in enough money to repay his investment, which Ham considered when drafting the agreement.[6]

Hagerty testified for defendants that she helped deposit $5 million in Geldermann capital with OCC on December 30, 1986, as required before Geldermann could clear any of SCP's market-maker accounts. The business James brought into Geldermann was not profitable.

Defendants introduced the testimony of two experts. Sheldon Cohen testified that, in his opinion, the operations and accounts of SCP possessed minimal value because the partnership had only a few market-maker accounts, and their staff and systems could be replicated easily. If SCP had remained independent instead of joining Geldermann, at the rate it was losing money it would not have remained in business much longer. In fact, Gus benefitted from the December 1986 agreement because it prevented SCP from suffering further losses and allowed Gus to recover part of his investment. John Patrick Garvey similarly testified that SCP possessed no value at the time of the December 1986 agreement. Geldermann saved

---

[6]Ham assisted in winding down SCP in 1987, including the transfer of money to Gus. James and Gus disagreed over whether Gus should be responsible for one-third of the partnership's losses. James offered to pay Gus the difference between the amount he loaned to the firm and the amount he already was repaid, minus one-third of the losses suffered by SCP, which Gus rejected.

money, however, by obtaining SCP's business and operation instead of trying to start up a similar business itself. From that perspective, the partnership was worth as much as $300,000 to Geldermann.

Bennett testified for defendants. In the fall of 1986, James showed him the letter from Gus that gave James the authority to negotiate. James was eager to complete an agreement because Gus planned to take out his capital. Ham confirmed that Gus was becoming adamant in his demands that James wind down the business. By the middle of December, James became more urgent about signing the agreement. After December 24, Geldermann took over SCP's office lease at James' request, because James did not want to be responsible for its cost. Geldermann also used SCP's clearing number although the company had a clearing number of its own.[7]

After the defense rested, Gus testified as a rebuttal witness. He never spoke to Bennett about renting the CBOE seats and did not return to SCP's offices after he returned the ledger on December 29, 1986. Neither James nor Ham ever told him that James would give Geldermann the business and key assets of SCP in exchange for a job.

At the close of the evidence, the jury returned a verdict in favor of defendants on the constructive fraud and conversion counts. After hearing arguments on the unjust enrichment claim, the court awarded Gus $176,560. Both parties appeal.

## I

■ Gus argues that he is entitled to judgment notwithstanding the verdict or, in the alternative, a new trial, on his constructive fraud and conversion claims. When reviewing the denial of a motion for judgment notwithstanding the verdict, a court must determine whether the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the moving party that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967); *Hollembaek v. Dominick's Finer Foods, Inc.*, 137 Ill. App. 3d 773, 780, 484 N.E.2d 1237 (1985). In ruling on such a motion, the court may not reweigh the evidence, or as-

---

[7]Bennett saw Gus in SCP's offices regularly during the first two weeks of January 1987. He knew nothing about Gus being told not to come to the offices. In fact, in mid-January, Gus offered to sell his furniture to a trader who recently joined Geldermann. In addition, Geldermann and Gus executed two indemnification agreements relating to the membership seats that Gus leased on the CBOE, and Geldermann paid Gus rental income for the two seats. Because Gus' presence at the offices appeared to upset James and Pokuta, Bennett eventually terminated this agreement.

sess the credibility of the witnesses, or enter a judgment notwithstanding the verdict "if there is any evidence *** demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992).

When deciding a motion for a new trial, the circuit court must weigh the evidence and set aside the jury's verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 455; *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089, 560 N.E.2d 969 (1990). A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Villa*, 202 Ill. App. 3d at 1089.

## A

■ Gus claims he overwhelmingly proved the elements of his conversion claim. To establish a claim for conversion, a party must prove by a preponderance of the evidence the following elements: (1) a right in the property; (2) the right to immediate, absolute, and unconditional possession of the property; (3) defendant's unauthorized and wrongful assumption of control, dominion, or ownership over the property; and (4) a demand for possession. *Ruiz v. Wolf*, 250 Ill. App. 3d 121, 124, 621 N.E.2d 67 (1993); *Seymour v. Williams*, 249 Ill. App. 3d 264, 272, 618 N.E.2d 966 (1993).

■ Defendants argue that Gus cannot assert a claim for conversion because the assets allegedly converted were intangible in nature. In this state, however, parties may recover for conversion of intangible assets. See *Conant v. Karris*, 165 Ill. App. 3d 783, 792, 500 N.E.2d 757 (1987) (holding that plaintiff could state a claim for conversion of confidential information). Assuming that conversion of intangible assets is legally cognizable, the jury's finding that defendants did not convert Gus' property was not against the manifest weight of the evidence, and its verdict in favor of defendants must be upheld. A key item of evidence with regard to that claim is the letter written by Gus, stating that James could "negotiate a deal on behalf of my interest" and "whatever deal you may or may not conclude, I will abide by it and I am obligated to accept." An agent's authority may be actual or apparent and, if actual, may be express or implied. *Granite Properties Ltd. Partnership v. Granite Investment Co.*, 220 Ill. App. 3d 711, 713-14, 581 N.E.2d 90 (1991). A jury reasonably could conclude from the language of the letter that James had actual, express authority to enter into the December 1986 agreement with Geldermann, by which Gus agreed to be bound.

Gus argues that James had the authority to negotiate, but not consummate, the agreement. He asserts that when James signed the December 1986 agreement without seeking the approval of SCP's partners, he exceeded the scope of his authority. Gus further accuses defendants of failing to investigate fully the scope of James' authority, citing Mack's testimony that he believed James possessed limited authority to negotiate.

Gus explicitly agreed in the letter, however, to be bound by the outcome of any deal James negotiated, from which the jury could infer that Gus gave James actual authority to make far-reaching decisions about the partnership, since Gus was the principal investor. James, therefore, was not required to ask the partners to review the December 1986 agreement before he signed it, and their lack of consent to the agreement does not render it invalid. In addition, testimony that it was executed in a "highly irregular" manner does not refute evidence that James possessed actual authority to enter into the agreement.

■ Defendants also presented evidence demonstrating that James had the apparent authority to execute the December 1986 agreement on behalf of SCP. Apparent authority is cognizable when a principal, through words or conduct, creates the reasonable impression in a third party that his agent is authorized to perform a certain act on his behalf. To prove the existence of apparent authority, a party must establish that: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) the third party, based upon his knowledge of the facts, possessed a good-faith belief that the agent possessed such authority; and (3) the third party relied to his detriment on the agent's apparent authority. *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 218 Ill. App. 3d 383, 390, 577 N.E.2d 1344 (1991).

Substantial evidence was introduced at trial that Gus knew of the pending agreement. Ham testified that he informed Gus of the general nature of the agreement, and Gus expressed his satisfaction with its terms. Gus saw officials from Geldermann visit the office on a regular basis, but never informed any of them that James could not complete the agreement. Gus did not speak with Zarr, Bennett, or Caputo when they visited the office, did not ask to be present at any of the negotiating sessions, and did not ask to see any drafts of the proposed agreement.

Mack's testimony that he believed James' authority was limited is insufficient to warrant reversal of the jury's verdict. All the other negotiating Geldermann officers who testified—Zarr, Bennett, and Caputo—believed that James had full authority. In addition, Mack

requested assurances regarding the scope of James' authority and received the letter written by Gus, which purports to grant James authority to do more than just negotiate the agreement.

Assuming, *arguendo*, that James did not possess actual or apparent authority, the evidence supported a finding that Gus ratified the agreement after its execution. Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation. *Progress Printing Corp. v. Jane Byrne Political Committee*, 235 Ill. App. 3d 292, 310, 601 N.E.2d 1055 (1992) (*Progress Printing*). For ratification to occur, the principal must, with full knowledge of the act, manifest an intent to abide and be bound by the transaction. *Peskin v. Deutsch*, 134 Ill. App. 3d 48, 55, 479 N.E.2d 1034 (1985). Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction. *Progress Printing*, 235 Ill. App. 3d at 310.

Here, Gus reviewed the December 1986 agreement shortly after its execution. Bennett saw Gus in the partnership's offices in January 1987, where Gus told him only that he believed his son would be a good employee for Geldermann. Ham and Pokuta both spoke with Gus several times after the agreement was signed, and Gus never expressed any dissatisfaction with its terms. As Ham and Pokuta began winding down partnership business, they sent several payments to Gus, who accepted the payments without protest. Acceptance of these payments alone did not constitute ratification of the agreement (*Peskin*, 134 Ill. App. 3d at 56), but Gus' earlier knowledge of the terms of the agreement, combined with undisputed evidence that he did not indicate to anyone at Geldermann that James was not authorized to execute it, supports the conclusion that ratification took place.

Gus argues that defendants owed a duty to verify whether James possessed the authority to enter into a contract on behalf of the partnership. The law requires only that defendants exercise *reasonable* diligence. *Progress Printing*, 235 Ill. App. 3d at 309. James presented himself to Geldermann officials as the person in charge of SCP, telling them that he would be conducting the negotiations on behalf of SCP. He and Martorello were listed as the sole partners in all CBOE materials. Gus was not named as a partner in the partnership agreement and never gave defendants any proof of his position in the partnership. Under these circumstances, defendants breached no duty to investigate further the scope of James' authority.

In addition, Gus failed to demand the return of his property. He

argues that doing so would have been futile, in that Geldermann moved into SCP's offices, hired away its employees, transferred the partnership's customer accounts, changed the name on the door of the premises, and barred Gus from the premises. On the other hand, defendants introduced testimony that Gus was not barred from the partnership's offices; was seen in the offices in February 1987, more than two months after James signed the agreement with Geldermann; sold his furniture to a market-maker who recently had joined Geldermann; and signed an indemnification agreement with Geldermann for the lease of his CBOE membership seats. This evidence raised a factual dispute involving conflicting testimony, precluding the entry of judgment notwithstanding the verdict. *Maple*, 151 Ill. 2d at 454.

From the foregoing it is clear that the jury's verdict on the conversion claim was not against the manifest weight of the evidence, and Gus therefore was not entitled to a new trial on that claim.

## B

Gus next argues that he conclusively established the elements of his claim for constructive fraud. He cited no authority for this argument, relying solely on the elements of a constructive fraud claim as explained in the instructions issued to the jury. Failure to cite any authority in support of an argument constitutes waiver of that issue on appeal. 155 Ill. 2d R. 341(e)(7); *Wasleff v. Dever*, 194 Ill. App. 3d 147, 156, 550 N.E.2d 1132 (1990). Absent waiver, the jury's verdict on the constructive fraud claim was not against the manifest weight of the evidence, as will be seen.

Constructive fraud includes any act, statement, or omission that is construable as a fraud because of its detrimental effect upon the public interest and public or private confidence. *Sale v. Allstate Insurance Co.*, 126 Ill. App. 3d 905, 922, 467 N.E.2d 1023 (1984). A claim for constructive fraud does not require proof of actual dishonesty or intent to deceive; it involves the breach of a legal or equitable duty that the law declares to be fraudulent, regardless of the moral guilt of the wrongdoer, because of its tendency to deceive others. *Maguire v. Holcomb*, 169 Ill. App. 3d 238, 243, 523 N.E.2d 688 (1988); *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.*, 159 Ill. App. 3d 834, 844, 512 N.E.2d 1286 (1987); *Sale*, 126 Ill. App. 3d at 922.

Constructive fraud can arise only if there is a confidential or fiduciary relationship between the parties. *Maguire*, 169 Ill. App. 3d at 243-44. When a principal-agent relationship is present, a fiduciary relationship arises as a matter of law. *State Security Insurance Co. v.*

*Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 595, 630 N.E.2d 940 (1994). Here, a fiduciary relationship arose between Gus and James by virtue of their positions as shareholders in the corporate entities who were members of the partnership, as well by James' status as an agent of Gus in negotiating the December 1986 agreement with Geldermann. James therefore owed Gus the duty to be honest and loyal in representing Gus' interests and was prohibited from acquiring personal interests adverse to Gus or from dealing independently of Gus for his own personal gain. *Beaton*, 159 Ill. App. 3d at 842.

To recover on his constructive fraud claim against defendants, James must be shown to have breached the fiduciary duty he owed Gus, and defendants must be shown to have known of the breach and accepted the fruits of the fraud. See *Beaton*, 159 Ill. App. 3d at 844. James testified that he never intended to defraud Gus and, when negotiating the December 1986 agreement with Geldermann, one of his primary concerns was finding a way to repay his father. Other Geldermann officials corroborated James' testimony, explaining that James repeatedly told them that his father was concerned about the business, and he needed to replace the capital in the partnership and repay his father. Ham said he spoke with Gus several times while he drafted the December 1986 agreement, and one of his priorities was ensuring that Gus received his money back.

Moreover, defendants produced abundant evidence of their lack of awareness regarding Gus' role in SCP. Only Mack testified that he believed James was a minor partner in the partnership and knew James wanted to keep certain information from his father; however, as noted previously, Mack also requested proof of James' authority, and he received the letter to that effect written by Gus. Bennett testified that he, too, saw that letter. Further, the three Geldermann officials who spoke with James on a regular basis—Caputo, Zarr, and Bennett—believed that James was the chief partner and manager of SCP, who possessed full authority to negotiate on its behalf. The three men testified that during the negotiating process, they did not know that Gus was a partner in SCP, believing that he was simply an investor in the partnership. Further, defendants believed that the agreement would be beneficial for Gus, in that he would finally receive the money he had invested in the partnership after making repeated demands for it.

The jury's verdict in favor of defendants on the conversion and constructive fraud claims was not against the manifest weight of the evidence. On this issue, the circuit court's denial of Gus' motion for judgment notwithstanding the verdict, or for a new trial, must be affirmed.

## II

Gus argues that the circuit court made erroneous evidentiary rulings, the cumulative effect of which prejudiced him and denied him a fair trial. The admissibility of evidence is within the sound discretion of the circuit court and will not be reversed absent clear abuse. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92, 658 N.E.2d 450 (1995). Evidentiary rulings will not be reversed unless the error "was substantially prejudicial and affected the outcome of trial." *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471, 569 N.E.2d 167 (1991).

## A

Gus first identifies as error the circuit court's decision allowing defendants to elicit testimony from Ham that Gus and James attempted to settle their dispute over the amount of money the partnership owed Gus before he filed the present action. Gus argues that the evidence was prejudicial because it allowed defendants to suggest to the jury that Gus sued Geldermann only after the settlement negotiations with James fell through.

██ Offers of compromise or settlement generally are inadmissible at trial (*Niehuss v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 143 Ill. App. 3d 444, 450, 492 N.E.2d 1356 (1986)) and such evidence must be barred if introduced to prove liability. *McGrath v. Chicago & North Western Transportation Co.*, 190 Ill. App. 3d 276, 280, 546 N.E.2d 670 (1989). Statements otherwise made by a party or on his behalf during the course of negotiations, which are inconsistent with the party's present position, however, may be introduced in evidence against him. *Niehuss*, 143 Ill. App. 3d at 450. If such evidence is introduced to prove an issue other than liability, such as possible bias on the part of a witness, its admission rests within the discretion of the circuit court. *McGrath*, 190 Ill. App. 3d at 281.

██ In the present case, testimony regarding the negotiations between Gus and James did not constitute an admission of liability by Gus and, therefore, was not *per se* inadmissible. The evidence instead was presented to support defendants' argument at trial that Gus initially approved of the December 1986 agreement because he believed he would be reimbursed for the full amount of his investment, and did not question James' authority to enter into the agreement until he learned, months later, that he would be responsible for a portion of the partnership's losses. In addition, James already had offered testimony on the same issue. There was no abuse of discretion in admitting this evidence.

## B

██ Gus next argues that, if evidence of the settlement negotia-

tions is admissible, he should have been allowed to testify that James was a defendant in this action. Gus cited no authority for this argument and therefore waived it on appeal. 155 Ill. 2d R. 341(e)(7). Absent waiver, the circuit court did not abuse its discretion in refusing to admit this testimony. Evidence offered for the sole purpose of emphasizing a party's wealth or poverty is immaterial and improper when it appeals to the prejudice of the jury. *Di Paolo v. Johnson*, 15 Ill. App. 3d 735, 739, 305 N.E.2d 194 (1973). Gus argues that the evidence would refute defendants' assertion that he sued them because they had "deep pockets." Here, Gus failed to establish the probative value of evidence that he previously sued, then dismissed, James in the present action. Such testimony would serve to emphasize James' poverty as compared to Geldermann's wealth as a large corporation and would not disprove defendants' contention. The court did not abuse its discretion in refusing to admit such evidence.

## C

Gus asserts that the circuit court erred in allowing defendants to introduce evidence that they lost money after taking over SCP's operations in December 1986. Gus contends that defendants improperly introduced the evidence for purposes of establishing the value of SCP. He also argues that the evidence prejudiced him, in that the jury might have decided against him on the liability issue solely because defendants lost money.

Damages arising from a conversion are fixed and complete as of the date of the conversion. *Jensen v. Chicago & Western Indiana R.R. Co.*, 94 Ill. App. 3d 915, 930, 419 N.E.2d 578 (1981). Accordingly, evidence of an object's value after the date and time of its conversion is inadmissible to prove damages. *Charles Selon & Associates, Inc. v. Estate of Aisenberg*, 103 Ill. App. 3d 797, 801, 431 N.E.2d 1214 (1981). Gus opened the door to this evidence, however, by eliciting testimony from James that the market-maker division of GSI earned money after December 1986 and testimony from his expert that, based upon financial projections prepared by Geldermann, the partnership was worth millions of dollars at the time of the conversion. Defendants were entitled to rebut that testimony through evidence that Geldermann was not made aware of SCP's financial problems when the projections were created, did not know that the partnership lost money and its biggest customer in 1986, and therefore suffered huge losses after purchasing the partnership's assets. See *Kwon v. M.T.D. Products, Inc.*, 285 Ill. App. 3d 192, 198, 673 N.E.2d 408 (1996). The circuit court did not abuse its discretion in admitting this evidence.

## D

■ Gus claims the circuit court erred in refusing to allow him to introduce a preliminary draft of a letter of intent prepared by Geldermann, arguing that the letter was relevant to show that defendants considered merging with or acquiring SCP. This document, however, established a fact that had been proven already through testimony by James, Zarr, Caputo and Bennett, as well as evidence that Geldermann entered into negotiations with other clearing firms about a possible merger or acquisition. Moreover, the manner in which defendants characterized the December 1986 agreement is irrelevant to both the conversion and constructive fraud claims, because the issue was not whether Geldermann acquired the assets of SCP, but whether defendants' actions were unauthorized or fraudulent. The circuit court did not abuse its discretion in refusing to admit the draft letter of intent.

## E

Gus disputes the circuit court's decision preventing him from introducing evidence of an internal OCC memorandum, which stated that OCC approval of Heinold "is strictly contingent upon the marriage" of Geldermann and SCP. Gus was permitted, however, to introduce statements contained in the memorandum through the testimony of Geldermann and OCC employees. The jury therefore heard evidence that Geldermann required the assistance of James and the assets of SCP in order to obtain memberships with the CBOE and the OCC. Gus therefore was not prejudiced by the court's decision not to admit this evidence.

## III

Both parties appeal the circuit court's decision in favor of Gus on the unjust enrichment claim. The court awarded damages based upon testimony by Geldermann's expert that defendants saved between $200,000 and $300,000 in start-up costs by acquiring the employees and operations of SCP. Geldermann also paid approximately $88,000 of SCP's debts. The court concluded that defendants were unjustly enriched in the amount of $212,000, and awarded Gus 88% of that amount, or $176,560, in proportion to the court's calculation of his share of the partnership.

In their cross-appeal, defendants claim that the entry of judgment in favor of Gus was against the manifest weight of the evidence and contest the amount of damages awarded. Gus also appeals the amount of damages awarded, claiming defendants were unjustly enriched by as much as $1.875 million, or half of the amount Gus contends Geldermann guaranteed James in the December 1986 agreement.

■ A plaintiff may recover under the theory of unjust enrichment if the defendant unjustly retained a benefit to plaintiff's detriment, and " 'defendant's retention of the benefit violates the fundamental principals of justice, equity and good conscience.' " *Alliance Acceptance Co. v. Yale Insurance Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971 (1995), quoting *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672 (1989). A cause of action based upon unjust enrichment does not require fault or illegality on the part of defendants; the essence of the cause of action is that one party is enriched and it would be unjust for that party to retain the enrichment. *Firemen's Annuity & Benefit Fund v. Municipal Employees', Officers', & Officials' Annuity & Benefit Fund*, 219 Ill. App. 3d 707, 712, 579 N.E.2d 1003 (1991). This principle, however, is based upon an implied contract; where there is a specific contract that governs the relationship of the parties, the doctrine has no application. *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 497, 607 N.E.2d 165 (1992).

■ In the present case, the December 1986 agreement precludes Gus from recovering under an unjust enrichment theory. The jury's verdicts on the constructive fraud and conversion claims necessarily were predicated upon a finding that Gus authorized James to enter into that agreement on behalf of Gus and SCP, or ratified the agreement through his subsequent conduct. Gus would be entitled to recover under a theory of unjust enrichment only in the absence of a valid, binding contract. As the parties acknowledge, the entry of judgment for Gus on the unjust enrichment claim is "irreconcilable" with the jury's verdict for defendant on the remaining claims. The circuit court therefore erred in awarding Gus damages based upon the theory of unjust enrichment.

Defendants also argue that the circuit court should have granted their motion to dismiss on the basis that Gus could not bring his lawsuit as an assignee of the partnership's claims. The court continued that motion until after trial, where it found the issue moot with respect to the constructive fraud and conversion claims in light of the jury's verdict. For purposes of the unjust enrichment claim, the court found the assignment to be valid. In light of our decision reversing the entry of judgment for Gus on that claim, the assignment issue is now moot with respect to all the claims and therefore need not be addressed here.

For the foregoing reasons, the circuit court's denial of Gus' motion for judgment notwithstanding the verdict or a new trial on the

conversion and constructive fraud claims is affirmed; the court's entry of judgment in Gus' favor on the unjust enrichment claim is reversed.

Affirmed in part and reversed in part.

HOFFMAN, P.J., and SOUTH, J., concur.