2026 IL App (1st) 251948-U

No. 1-25-1948

Order filed May 12, 2026

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| BANANA STAND ACQUISITIONS LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 25 L 2906 |
| | ) | |
| LEVENFELD PEARLSTEIN, LLC, and HAROLD D. ISRAEL, | ) | Honorable |
| | ) | Daniel J. Kubasiak, |
| | ) | Judge, presiding. |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices Ellis and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's order granting defendants' motion to compel arbitration.

¶ 2    Plaintiff Banana Stand Acquisitions, LLC ("BSA") appeals from the circuit court's order compelling arbitration. For the reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4    BSA filed a one-count complaint for legal malpractice against defendants Levenfeld Pearlstein, LLC, a law firm, and Harold D. Israel, one of the firm's attorneys. BSA alleged that it held a perfected security interest as the "first position secured creditor" in the assets of a distressed debtor named Triple Aught Design, LLC (Triple Aught). As part of their representation of BSA, defendants were responsible for maintaining that security interest. In March 2023, BSA informed defendants that it wanted to foreclose on its security interest in Triple Aught. Defendants revealed that they had mistakenly allowed BSA's security interest to lapse. Defendants advised BSA to wait 90 days before foreclosing on the security interest because the security interest could be "re-perfected" during that time, thereby restoring BSA's position as Triple Aught's first secured creditor. BSA did as defendants advised. However, during the 90-day period, Triple Aught's business "decline[d] precipitously," which impaired the value of its assets. BSA alleged that if it had foreclosed in March 2023, BSA could have asserted control over Triple Aught's assets sooner and prevented the decline.

¶ 5    Defendants filed a motion to either compel arbitration or dismiss BSA's complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2024)). Defendants argued that Noah Wrubel, on behalf of BSA's predecessor Newco LLC, retained defendants for legal representation for the Triple Aught investment. Wrubel, on behalf of Newco, signed a March 14, 2021, attorney-client agreement that defined the scope of representation, the parties' rights and obligations, and included an arbitration provision. Defendants contended that although Newco was not yet incorporated when Wrubel signed the agreement, Newco eventually incorporated on November 3, 2021, under the name of "Banana Stand Acquisition[*sic*] LLC."

¶ 6    In support of its motion, defendants attached (1) the signed attorney-client agreement; and (2) attorney Harold D. Israel's affidavit. The attorney-client agreement provides, in relevant part, that defendants would represent " 'Newco LLC' (name to be changed upon formation, and referred to in this letter as 'Company') in connection with the Company's analysis about whether to invest in Triple Aught Design, LLC ('Triple Aught')." Attorney Israel would "have the primary responsibility for" "analyzing Triple Aught's current debt and equity documents (including if possible, talking to certain of the parties) to determine how to best structure such an investment (or to not invest)." If Newco decided to invest in Triple Aught, defendants would be responsible for "documenting the transaction" and other "additional matters as agreed upon going forward." The attorney-client agreement provided defendants' hourly rates and required an initial retainer payment of $6,500. The attorney-client agreement incorporated an attached "Standard Terms of Engagement for Legal Services," and specified that those terms would "govern both the present engagement and any future assignments [defendants] accept from [Newco]." Those terms included the following arbitration provision:

> "**Dispute Resolution.** Any demands, claims or controversies arising out of or relating to this contract or the services provided by our firm, (including, but not limited to, fees or costs, breach of contract, tort claims or professional negligence), shall be settled by binding arbitration before ADR Systems of America in Chicago[,] Illinois and in accordance with the Arbitration Rules of ADR Systems of America, and judgment upon the award rendered by the arbitrator may be entered in any court or tribunal having jurisdiction thereof. Either party may commence the arbitration process called for in this agreement by filing a written demand for arbitration with ADR Systems of America. The

arbitration will be conducted in accordance with the ADR Systems of America Arbitration Rules and Procedures in effect at the time of filing of the demand for arbitration. The parties will select one arbitrator from ADR Systems of America's panel of neutrals and will share equally in the costs. The prevailing party shall be awarded attorney[] fees. The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorney[] fees, to be paid by the party against whom enforcement is ordered."

¶ 7 The attorney-client agreement advised Wrubel to contact defendants if he had any questions, "comments, concerns or changes" to the terms and requested a signature to indicate agreement to "the terms and conditions set forth in the attachment." Wrubel signed the attorney-client agreement "[o]n behalf of Newco LLC (to be updated upon establishment of Company)."

¶ 8 Israel's affidavit attested that he performed legal services for BSA as specified in the attorney-client agreement and that there were no other agreements between BSA and defendants. Israel attested that Newco "was later formed under the name Banana Stand Acquisition[*sic*] LLC." He further attested that after receiving the signed attorney-client agreement, defendants assigned Newco a client number and case number. After BSA's incorporation, defendants continued to bill BSA under the same client and case number.

¶ 9 In response, BSA argued that it was not a party to the attorney-client agreement between Newco and defendants, and was not Newco's successor. BSA also contended that Wrubel did not have the authority to execute a contract on its behalf before it even existed. In addition, BSA argued that the arbitration provision was procedurally unconscionable because defendants never fully informed Wrubel of the ramifications of the arbitration provision, citing *Dick-Ipsen v. Humphrey, Farrington & McClain, P.C.*, 2024 IL App (1st) 241043.

¶ 10    In support of its response, BSA attached (1) what appears to be a website printout from the Delaware Division of Corporations indicating that "Banana Stand Acquisition[*sic*] LLC" was incorporated on November 3, 2021, several months after Wrubel signed the agreement; (2) Wrubel's affidavit; and (3) an e-mail chain between Wrubel and defendants regarding the agreement. Wrubel's affidavit attested that Newco did not exist when he signed the attorney-client agreement, and that Newco never incorporated thereafter. He further attested that (1) BSA was not Newco's successor, (2) the attorney-client agreement was never updated after BSA's incorporation on November 3, 2021, (3) no one informed BSA of the arbitration provision and BSA never agreed to it, and (4) BSA did not ratify or adopt the agreement after incorporation. Wrubel attested that he had worked in the business field for over 25 years, but he was not a lawyer and had no legal training. Although he had "heard of the concept of arbitration", he "did not understand any of the consequences" of an arbitration provision or what the term "arbitration" meant. Wrubel attested that defendants never discussed the arbitration agreement with him and he did not "make an informed decision about whether to agree to the arbitration provision." The e-mail chain reflects that Wrubel reviewed at least two drafts of the agreement and defendants asked Wrubel if he had any questions or comments following each draft provided for Wrubel's review. Wrubel asked defendants to correct the spelling of his name and successfully negotiated a reduced retainer payment but did not ask any other questions.

¶ 11    Defendants' reply argued that BSA ratified the agreement after incorporation and also argued that the arbitration provision was not procedurally unconscionable. Defendants' reply attached what appears to be a printout of Wrubel's LinkedIn profile in support. The profile shows that Wrubel graduated from Carnegie Mellon University, was a "Buyer" for Lord & Taylor for 5

years, an "Intimate Apparel GM" for Walmart eCommerce for 2 years, CEO of Bare Necessities for over 26 years, and CEO of Triple Aught and CODEWORD Brands, Inc. for over a year.

¶ 12     The circuit court granted defendant's motion to compel arbitration, finding that the arbitration clause in the attorney-client agreement bound BSA. Citing *Tin Cup Pass Ltd. Partnership v. Daniels*, 195 Ill. App. 3d 847, 850 (1990), the court explained that a "promoter" can sign a contract on behalf of an unformed corporation and that contract becomes enforceable when the corporation forms and ratifies the contract. The court reasoned that Wrubel acted as a "promoter" for Newco, which later incorporated as BSA, because he "actively assist[ed] in creating, projecting, and organizing" the company. The court also found that BSA ratified the attorney-client agreement because it agreed to pay the retainer specified in that agreement and accepted the benefit of defendants' representation in the Triple Aught transaction.

¶ 13     The circuit court also held that the arbitration clause was not procedurally unconscionable because BSA did not  allege any facts to show procedural unconscionability, other than claiming defendants failed to explain the arbitration provision to Wrubel. The court distinguished *Dick-Ipsen* , explaining that the plaintiff in that case was an "uneducated, unsophisticated, elderly client who had Parkinson's disease" and the defendants' attorneys offered "no explanation about the arbitration provision" in the attorney-client agreement. By contrast, Wrubel was "much more sophisticated" because he had more than 25 years of experience in business and was aware of the concept of arbitration when he signed the attorney-client agreement.

¶ 14     BSA timely appealed.

¶ 15                                         II. ANALYSIS

¶ 16    BSA argues that the circuit court erred in compelling arbitration because (1) BSA is not a party to the attorney-client agreement between Newco and defendants and (2) the arbitration provision is procedurally unconscionable.

¶ 17    BSA appeals pursuant to Supreme Court Rule 307(a)(1), which allows an interlocutory appeal of an order "granting, modifying, dissolving, or refusing to dissolve or modify an injunction." Ill. S. Ct. R. 307(a)(1) (eff. Nov. 1, 2017). A circuit court's order compelling arbitration is "injunctive in nature," so we have jurisdiction pursuant to Rule 307(a)(1). See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11 (2001). "Generally, where an interlocutory appeal is brought under Rule 307(a)(1), the only issue is whether there was a showing sufficient to sustain the circuit court's order granting or denying the motion to compel arbitration." *Gaines v. Ciox Health, LLC*, 2024 IL App (5th) 230565, ¶ 24. When the circuit court grants a motion to compel arbitration "without an evidentiary hearing and raises only legal issues, our review is *de novo*." *In re Estate of Dukes*, 2025 IL App (5th) 240645, ¶ 17.

¶ 18    An arbitration clause is a written provision within a contract that requires the parties to arbitrate any disputes that the parties have agreed to submit to arbitration. *Gaines*, 2024 IL App (5th) 230565, ¶ 26. An attorney-client agreement may include an arbitration provision, " 'provided such agreements are enforceable and the client is fully informed of the scope and effect of the agreement.' " *Dick-Ipsen*, 2024 IL App (1st) 241043, ¶ 18 (quoting Ill. R. Prof'l Conduct (2010) R. 1.8 cmt. 14 (eff. Jan. 1, 2010)). However, an agreement to arbitrate "may be invalidated by a state law contract defense of general applicability, such as fraud, duress, or unconscionability." *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 113204, ¶ 18.

¶ 19                          A. Arbitration Agreement

¶ 20    BSA first argues that it is not a party to the attorney-client agreement containing the arbitration provision and Wrubel had no authority to enter into that agreement.

¶ 21    The promoter of a company " 'actively assists in creating, projecting and organizing a corporation.' " *DiCosola v. Ryan*, 2015 IL App (1st) 150007, ¶ 14 (quoting *Tin Cup*, 195 Ill. App. 3d at 850). Generally, a "promoter" may sign a contract on behalf of an unformed corporation and that contract becomes enforceable when the corporation forms and ratifies the contract. See *Tin Cup*, 195 Ill. App. 3d at 850-51 (citing *H. F. Philipsborn & Co. v. Suson*, 59 Ill. 2d 465, 470-72 (1974)). Ratification may be inferred from the conduct of the parties, such as retaining the benefits of the contract or taking a position showing an intent to be bound. See *Stathis v. Geldermann, Inc.,* 295 Ill. App. 3d 844, 858 (1998) (possessing knowledge of the terms of agreement and accepting payment under those terms without repudiation constitutes ratification). A preincorporation contract is enforceable against a company that incorporated under a name other than that identified in the contract, if the corporate entity contemplated by the parties did not change in any significant aspect other than its name. *Tin Cup*, 195 Ill. App. 3d at 851.

¶ 22    We find that the attorney-client agreement between Newco and defendants is enforceable against BSA. A promoter may execute a contract on behalf of an unformed corporation, and that contract becomes enforceable if the company adopts or ratifies the contract after formation. *H. F. Philipsborn & Co. v. Suson*, 59 Ill. 2d 465, 470-72. There is no dispute that Wrubel was Newco's promoter and signed the attorney-client agreement on its behalf. The attorney-client agreement provides that defendants would provide legal services to an unformed corporation for the Triple Aught investment. The record is clear that the parties used "Newco" as a placeholder name, by specifying that the name would "be changed upon formation" and would be "updated upon

establishment of Company." It is also clear that the parties knew the unformed company was considering investing in Triple Aught and wanted to retain defendants for that transaction. Several months after Wrubel signed the attorney-client agreement, BSA, of which Wrubel is a member, filed articles of incorporation and there is nothing in the record to indicate there was any difference between Newco and BSA. See *Tin Cup*, 195 Ill. App. 3d at 851 ("we find the fact that the corporation was eventually incorporated under a name other than that identified in the lease to be of no significant consequence"). BSA conducted itself in all respects as if it was Newco. It invested in Triple Aught, paid defendants' retainer, and also accepted and paid for defendants' legal services for the Triple Aught transaction. BSA's conduct after incorporation supports the conclusion that BSA ratified the attorney-client agreement. See *Steven v. Falese Land Co.*, 50 Ill. App. 3d 231, 239 (1977) (corporation ratified contract when it assumed and performed many of the contractual obligations); *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 12 Ill. App. 3d 362, 365 (1973) ("retaining the benefits is tantamount to ratification").

¶ 23     We find the court's ruling in *Tin Cup* illustrative. In that case, the promoters signed a lease on behalf of a corporation to be formed under the name of D & M, Inc. *Tin Cup*, 195 Ill. App. 3d at 849. When the promoters filed the articles of incorporation, the Secretary of State informed them that the name was already taken, so the promoters had to choose another. *Id.* The corporation then formed under the name of "The Lodge at Tin Cup Pass, Inc." and opened for business. *Id.* Over a year later, the landlord filed suit against the promoters for unpaid rent under the lease. *Id.* On appeal, this court held that the promoters could not be held liable under the lease because the parties clearly intended "to create a lease with a corporation as the lessee," the landlord treated the corporation as the lessee, and the corporation ratified the lease by using the premises pursuant to

the lease. *Id.* at 851. Further, this court found that it did not matter that the corporation was incorporated under a different name than that in the lease, because nothing changed about the corporation contemplated by the parties when entering into the lease, other than the name. *Id.* That is precisely what occurred here. Wrubel signed the attorney-client agreement on behalf of Newco, an unformed company, whose name would "be changed upon formation", for legal services concerning the Triple Aught investment. After BSA's incorporation, it accepted defendants' legal services for the Triple Aught investment and paid defendants' retainer and invoices. Accordingly, we find that there is an agreement between BSA and defendants.

¶ 24    Citing *Carollo v. Irwin*, 2011 IL App (1st) 102765, ¶¶ 35, 41-42, *overturned on other grounds due to legislative action*, 805 ILCS 180/10-10 (West 2020), BSA argues that Wrubel had no authority to enter a contract on behalf of Newco because Newco did not exist, and never existed. BSA contends that *Carollo* stands for the proposition that a non-existent LLC may not authorize an agent to enter a contract on its behalf. *Id.* ¶ 45. However, *Carollo* is distinguishable because in that case, a subsequent corporation "was never formed, and so it never adopted or ratified" the preincorporation agreement. *Id.* ¶ 42. Indeed, *Carollo* recognized that promoters may execute contracts on behalf of a corporation before its organization if the corporation ratifies the contract after incorporation. *Id.* ¶ 35. That is exactly what occurred here. Wrubel executed the attorney-client agreement on behalf of an unformed corporation, which eventually incorporated under the BSA name. BSA then ratified that agreement by complying with the terms of that attorney-client agreement. See *Steven*, 50 Ill. App. 3d at 239; *George F. Mueller & Sons*, 12 Ill. App. 3d at 365. As such, *Carollo* offers BSA no support.

¶ 25    BSA also argues that the circuit court erred in resolving the factual dispute as to the relationship between Newco LLC and BSA without holding an evidentiary hearing. However, BSA did not raise this argument in the circuit court and raises it for the first time in its reply brief, thus it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 26                            B. Procedural Unconscionability

¶ 27    BSA further argues the arbitration provision is procedurally unconscionable because defendants never sufficiently informed Wrubel of the ramifications of agreeing to arbitrate a legal malpractice claim.

¶ 28    An arbitration agreement is a contract and "may be invalidated by a state law contract defense of *** unconscionability." *Carter*, 2012 IL 113204, ¶ 18. A contract may be unenforceable if it is procedurally unconscionable. *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60 (2011) (citing *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22 (2006)). Procedural unconscionability refers to " 'some impropriety' " during the formation of a contract that deprives a party of meaningful choice. *Kinkel*, 223 Ill. 2d at 23 (quoting *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 989-90 (1980)). Courts consider all of the circumstances surrounding the formation of the contract, such as "whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Id.* Courts may also consider the parties' experience and education, whether the contract contained fine print, and if high-pressure tactics were used. *Coe v. BDO Seidman, LLP*, 2015 IL App (1st) 142215, ¶ 31. Procedural unconscionability exists when the contractual terms are "so difficult to find, read, or understand" that a party cannot reasonably be expected to understand them. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100 (2006).

¶ 29    We find that the arbitration provision is not procedurally unconscionable. The two-page terms of engagement includes the arbitration provision at the bottom of the second page, with a bold heading titled "Dispute Resolution." It provides, in relevant part, that the parties must arbitrate "[a]ny demands, claims or controversies arising out of or relating to this contract or the services provided," including claims of professional negligence. The provision explained the arbitration process and how fees and expenses are handled. The arbitration provision is conspicuous and nothing is hidden in a maze of fine print. See *Phoenix Insurance Co.*, 242 Ill. 2d at 60; *cf. Kinkel*, 223 Ill. 2d at 27 (arbitration agreement unconscionable where it provided no terms regarding costs of arbitration, and only stated that such information was available upon request). Wrubel is a very experienced and sophisticated businessperson, who graduated from Carnegie Mellon University and held several high power positions within several large corporations, including Walmart and Bare Necessities. See *Coe*, 2015 IL App (1st) 142215, ¶ 31. Further, the arbitration provision was plainly visible, the meaning of its terms were clear, and BSA fails to show that defendants committed any impropriety, coercion, or overreaching as to render the arbitration provision procedurally unconscionable. See *id.* Wrubel had several opportunities to review the arbitration provision and either ask for more information, request a modification of those terms, or reject defendants' services. See *Sherrier v. Alliant Credit Union*, 2022 IL App (1st) 211214-U, ¶ 80. Although Wrubel successfully asked for a reduction to the retainer and to correct the spelling of his name, he asked no questions and raised no concerns about anything else in the agreement. Wrubel's signature "legally signifies" that he reviewed and understood the terms of the agreement, thus he may not later claim that he did not understand the terms. *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 14.

¶ 30    Nonetheless, BSA argues the arbitration provision is procedurally unconscionable because defendants failed to fully inform Wrubel of the scope and effect of the arbitration provision, citing *Dick-Ipsen*, 2024 IL App (1st) 241043. We find *Dick-Ipsen* distinguishable and does not compel reversal.

¶ 31    In *Dick-Ipsen*, plaintiff developed Parkinson's disease and retained defendants, a law firm, for representation in suing certain chemical manufacturers and suppliers that may have caused it. *Id.* ¶ 1. After several of plaintiff's claims were dismissed as untimely, plaintiff sued the defendants for legal malpractice. *Id.* Defendants moved to compel arbitration because plaintiff had signed an attorney-client agreement that included an arbitration provision. *Id.* ¶ 10. Plaintiff provided an affidavit in opposition, attesting that defendants failed to inform him and that he did not know the legal consequences of agreeing to arbitrate his legal malpractice claim or that he would have to pay for half of the arbitration costs and also travel over 500 miles to arbitrate, even though he had lost his driver's license after the Parkinson's diagnosis. *Id.* ¶ 11. The circuit court denied defendant's motion and this court affirmed. *Id.* ¶¶ 12, 39.

¶ 32    This court held that the arbitration provision contained within the attorney-client agreement was procedurally unconscionable due to plaintiff's diminished capacity and lack of sophistication. *Id.* ¶¶ 29-30. This court looked to the Illinois Supreme Court Rules of Professional Conduct for guidance and held that defendants' failure to fully inform plaintiff of the scope and effect of the arbitration clause was an impropriety that deprived plaintiff from making a meaningful choice. *Id.* ¶¶ 27, 35. Plaintiff was "a disabled individual with a progressive neurological disease" and had "worked as a dry cleaner since graduating from high school," whereas defendants were "sophisticated attorneys who have earned multi-million-dollar settlements and verdicts in high-

profile litigation." *Id.* Although "defendants discussed several of the other material terms of the attorney-client agreement with plaintiff—such as the amount of the fee, the nature of a contingent fee agreement, and the intended scope of work—defendants never mentioned anything about the arbitration clause." *Id*. ¶ 28. This court also rejected defendants' argument that plaintiff's signature indicated he understood and agreed to the arbitration provision "due to plaintiff's specific circumstances, the disparity in sophistication between the parties, and the unique aspects of the attorney-client relationship." *Id.* (citing *Castillo v. Arrieta*, 2016-NMCA-040, ¶ 16).

¶ 33   *Dick-Ipsen* is distinguishable. In *Dick-Ipsen*, the plaintiff had a high school education, worked as a dry cleaner all his life, and suffered from a "progressive neurological disease." *Id.* ¶ 28. Here, Wrubel is college educated, has over 25 years of experience in business, and nothing in the record reflects that he suffers from any diminished capacity. See *Coe*, 2015 IL App (1st) 142215, ¶ 31 (courts consider the parties' experience and education); see also Ill. R. Prof'l Conduct (2010) R. 1.4 cmt. 6 (eff. Jan. 1, 2016) ("the information to be provided is that appropriate for a client who is a comprehending and responsible adult," unless the client is a child or "suffers from diminished capacity."). The email chain between Wrubel and defendants indicates that Wrubel reviewed at least two drafts of the engagement letter, successfully negotiated a lower retainer, and did not ask defendants any questions, despite defendants' multiple prompts for questions. Further, nothing in the record indicates a disparity in sophistication between the parties or that there were any special circumstances to warrant additional consideration. *Cf. Dick-Ipsen*, 2024 IL App (1st) 241043, ¶ 28 (attorney had greater duty to inform due to plaintiff's "progressive neurological disease" and lack of sophistication). The totality of the circumstances in this case shows that there

was no impropriety in the formation of the agreement and the arbitration provision is not procedurally unconscionable.

¶ 34                                    III. CONCLUSION

¶ 35    For the foregoing reasons, we affirm the circuit court's order compelling the parties to arbitration.

¶ 36    Affirmed.