JOHN PRODROMOS, Plaintiff-Appellant, v. EVEREN SECURITIES, INC., *et al.*, Defendants-Appellees (Dennis Klaeser,[1] Defendant).

First District (4th Division)   No. 1—02—1365

Opinion filed June 26, 2003.

---

[1]The circuit court dismissed all claims against Klaeser and that ruling is not part of this appeal.

Collins & Bargione, of Chicago (George B. Collins, Christopher Bargione, and James J. Lessmeister, of counsel), for appellant.

Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., of Chicago (John H. Ward, Edward D. Shapiro, and Wendy B. Kahn, of counsel), for appellees.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, John Prodromos, filed a four-count first amended complaint against defendants, Everen Securities, Inc. (Everen), Principal Financial Securities, Inc. (Principal), Daniel Westrope, and Dennis Klaeser, alleging breach of fiduciary duty and fraud in connection with defendants' alleged usurpation of plaintiff's proposed purchase of Home Federal Savings Bank (Home Bank). The circuit court granted summary judgment in favor of defendants on count I (breach of fiduciary duty) and counts II and IV (fraud) of the first amended complaint, from which plaintiff appeals.

Principal was a securities brokerage firm that had both a retail sales and an investment banking branch. In January 1998, Principal merged with Everen. Westrope was employed by Everen as an investment banker from June 1995 until February 1998. Plaintiff was a retail brokerage client of Everen.

Prior to January 1998, plaintiff wanted to acquire and take over operation of Home Bank, which plan he communicated to Steven Golber, his retail broker at Everen. Golber set up a January 1998 meeting with plaintiff and Westrope, at which plaintiff explained his ideas regarding Home Bank. Westrope agreed to call institutional shareholders of Home Bank stock to see if they would vote their proxies in favor of plaintiff. Westrope did not know about Home Bank prior to this meeting. In February 1998, Westrope left Everen and began working at State Financial Services Corporation (State Financial). In June 1998, State Financial acquired Home Bank and Westrope was named regional president of the newly acquired bank. In June 1998, Everen was engaged by State Financial to write the fairness opinion on Home Bank.

Based on these facts, plaintiff filed his first amended complaint. Count I alleged breach of fiduciary duty against Westrope and Everen. Count II alleged fraud against Westrope, and count IV alleged that Everen was vicariously liable for that fraud.[2]

Golber testified by deposition that, at plaintiff's request, he

---

[2]Count III of plaintiff's first amended complaint alleged fraud and was directed solely against Klaeser. Count I included breach of fiduciary duty allegations against Klaeser.

provided plaintiff with public information regarding Home Bank in 1997. He bought Home Bank stock in order to secure the bank's annual reports and other financial information. Golber also helped plaintiff purchase Home Bank stock. Plaintiff explained his ideas about acquiring and taking over operation of Home Bank. Golber set up the January 1998 meeting with plaintiff and Westrope at which plaintiff explained his ideas regarding Home Bank. Westrope suggested contacting institutional shareholders to see if they would vote their proxies in favor of plaintiff and agreed to make those phone calls. No engagement letter was signed at the meeting and there was no discussion of fees. Golber called Janus Funds, one of the institutional investors, and was told that they had sold their position in Home Bank.

After learning that Westrope had left Everen, Golber set up a meeting in early March 1998 with plaintiff and Klaeser, an investment banker at Everen. At the meeting, plaintiff explained his ideas regarding Home Bank. Klaeser told plaintiff that Everen could not help him because Everen did not do hostile takeovers.

In June 1998, Golber learned that State Financial had acquired Home Bank. Golber contacted Robert Ollech, who told him that the State Financial/Home Bank deal was Westrope's deal. Golber called plaintiff and informed him of the State Financial/Home Bank deal and Ollech's comments regarding Westrope. Golber admitted that he did not do any investigation into what role, if any, Westrope or Everen played in the State Financial/Home Bank deal.

Plaintiff testified by deposition that he discussed his Home Bank idea with Golber in late 1997 or January 1998. At the January 1998 meeting with Golber and Westrope, Westrope agreed to contact institutional investors to see whether they would back their voting power for plaintiff and whether anyone would want to buy stock in Home Bank because of new management. There was no discussion of a formal engagement letter at the meeting. According to plaintiff, Westrope said that the fees would depend on what he had to do. Westrope indicated that Everen might want to invest in the deal. Plaintiff stated that there was never a more specific discussion of fees because "we never got to the point of what they were going to do." Plaintiff contacted Westrope several times following the meeting, but never discussed an engagement letter or fees. Westrope informed plaintiff that one mutual fund already had sold its Home Bank stock and that he had contacted two others and was waiting for responses.

In March 1998, Golber informed plaintiff that Westrope had left Everen. Plaintiff met with Golber and Klaeser. During that meeting, plaintiff told Klaeser that they needed enough votes to get two people

on the board of Home Bank, whether it took buying stock or mutual fund backing. According to plaintiff, Klaeser was "extremely rude" and said we do not do anything like this. After this meeting, plaintiff contacted Dean Witter and Merrill Lynch in New York. Both requested that he come to New York to present his idea. Plaintiff refused. Plaintiff met with George Moser, who owned three banks, regarding his desire to take over operation of Home Bank. Moser testified by deposition that plaintiff had put together an investor group to acquire Home Bank and asked if he wanted to participate. Moser agreed to participate, but the amount of his investment was never formalized.

At some point after the March 1998 meeting, plaintiff contacted Banco Popular regarding the Home Bank deal, but halted discussions when Banco Popular requested more specific information. After learning of the State Financial/Home Bank deal, plaintiff discussed his ideas regarding Home Bank with Saul Binder at Success Bank. According to plaintiff, Binder offered him 2.5% of the acquisition price as a commission if Success Bank acquired Home Bank. Binder sent a letter to plaintiff expressing Success Bank's interest in the Home Bank deal. Plaintiff presented that letter to Home Bank. Plaintiff received a letter from Home Bank indicating that it was not interested in the Success Bank deal.

Plaintiff testified by deposition that he had no information that Everen provided investment banking service to State Financial in its takeover of Home Bank. Plaintiff further stated that he had no factual basis for his allegation that Westrope used plaintiff's confidential information to get a position at State Financial.

Daniel Westrope testified by deposition that he met with plaintiff and Golber in January 1998. At the meeting, plaintiff discussed his ideas regarding Home Bank. Prior to the meeting, Westrope did not know about Home Bank and he did no research on it following the meeting. Westrope offered to call institutional shareholders of Home Bank as an accommodation to a client of the firm. Westrope's intention in making the calls was to try to put dissatisfied shareholders in touch with plaintiff. Westrope made some calls, but received no responses.

While at Everen, State Financial was one of Westrope's clients. Westrope's responsibilities included identifying potential acquisition candidates for State Financial. Westrope stated that he had been in discussions with State Financial regarding a job since December 1997. He left Everen and joined State Financial in February 1998. Westrope stated that he never identified Home Bank to State Financial as a potential merger or acquisition candidate. The first time he discussed Home Bank with anyone at State Financial was when he was called to

a meeting with Michael Falbo and Steven Hovde in March 1998, where Hovde presented Home Bank as a potential merger or acquisition candidate.

Dennis Klaeser testified by deposition that he told plaintiff in March 1998 that he was surprised Westrope had agreed to make the telephone calls for plaintiff because Everen did not get involved with hostile takeovers. He stated that he and Everen were engaged in early June 1998 to prepare a fairness opinion on Home Bank for State Financial. Everen was paid $250,000 to prepare the fairness opinion. Klaeser further indicated that if Westrope had been engaged by a client, he "absolutely would have known."

Michael Falbo, president and chief executive officer of State Financial, testified by deposition that when Westrope was working at Everen he would look for potential acquisitions for State Financial. Westrope did not, however, suggest Home Bank as a possible acquisition candidate. Falbo learned about Home Bank from Steven Hovde in March 1998. According to Falbo, State Financial engaged an outside firm to do a fairness opinion on Home Bank after a definitive agreement had been reached with Home Bank.

Steven Hovde, executive vice president of Hovde Financial, testified by deposition that Hovde Financial acts as an investment banker in the sale of banks. In September 1997, Hovde Financial was retained by Home Bank to facilitate a merger or sale of the bank. At that time Hovde created a list of about 20 potential buyers which did not include State Financial. Hovde stated that he identified State Financial as a second-tier potential buyer for Home Bank in 1997 or 1998. He presented the Home Bank acquisition opportunity to State Financial at a meeting in March 1998.

Defendants successfully moved for summary judgment on counts I (fiduciary duty), II (fraud) and IV (vicarious liability for fraud) of the amended complaint. With regard to count I, the circuit court found there was no genuine issue of fact regarding the existence of a fiduciary relationship. "Without any evidence of the creation of a fiduciary relationship, there can be no action for breach thereof, and so summary judgment in favor of Westrope and Everen is entered." With regard to counts II and IV, the court found that there was no evidence that Westrope's alleged fraudulent conduct was a proximate cause of plaintiff's damages.

■ Summary judgment will be granted when the pleadings, depositions, exhibits, and affidavits on file reveal no genuine issue as to any material fact and establish that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 2000); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 607

N.E.2d 1204 (1992) (*Outboard Marine*). All evidence must be construed in the light most favorable to the nonmoving party and most strictly against the moving party. *Gatlin v. Ruder*, 137 Ill. 2d 284, 560 N.E.2d 586 (1990). Plaintiff need not prove his case at the summary judgment stage, but must identify some facts that arguably would entitle him to judgment. *Reese v. Forsythe Mergers Group, Inc.*, 288 Ill. App. 3d 972, 682 N.E.2d 208 (1997). Appellate review of orders granting summary judgment is *de novo*. *Outboard Marine*, 154 Ill. 2d at 102.

## I

Plaintiff first contends that the circuit court erred in granting summary judgment in favor of defendants on count I. Specifically, plaintiff argues that a principal-agent relationship existed between Westrope and plaintiff and a fiduciary relationship arose therefrom as a matter of law. See *Stathis v. Geldermann, Inc.*, 295 Ill. App. 3d 844, 859, 692 N.E.2d 798 (1998) (*Stathis*) ("[w]hen a principal-agent relationship is present, a fiduciary relationship arises as a matter of law"). Therefore, defendants owed plaintiff the duty to be honest and loyal in representing plaintiff's interests, and were prohibited from acquiring personal interests adverse to plaintiff, or from dealing independently of plaintiff for their own personal gain. *Stathis*, 295 Ill. App. 3d at 860. See also Restatement (Second) of Agency § 13, Comment *a* (1958).

■ Agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf. *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 759 N.E.2d 174 (2001). If a fiduciary relationship exists, any transaction between the parties in which the agent profits is presumed to be fraudulent and the agent has the burden of proving by clear and convincing evidence that the transaction was fair and equitable. *In re Estate of Miller*, 334 Ill. App. 3d 692, 778 N.E.2d 262 (2002). The question of whether a principal-agent relationship exists generally is a question of fact; however, a court may decide the issue as a matter of law if only one conclusion may be drawn from the undisputed facts. *Churkey v. Rustia*, 329 Ill. App. 3d 239, 768 N.E.2d 842 (2002).

■ Defendants argue that there was no evidence of an agency relationship where plaintiff's sole contact with Westrope was one meeting that did not result in either an engagement letter or a fee agreement. Defendants cite no authority to support their contention that either or both are necessary before an investment banking relationship can materialize. The existence of an agency relationship and its nature and extent may be established by circumstantial

evidence, including the situation of the parties, their acts, and other relevant circumstances. *Tomaso v. Plum Grove Bank*, 130 Ill. App. 3d 18, 473 N.E.2d 588 (1985) (*Tomaso*). An agency relationship does not depend on an express appointment or acceptance by the principal and agent. *Tomaso*, 130 Ill. App. 3d at 23. Section 16 of the Restatement (Second) of Agency notes that "[t]he relation of principal and agent can be created although neither party receives consideration." Restatement (Second) of Agency § 16 (1958).

■ The record reveals that both Golber and Westrope were employed by Everen when they performed services for plaintiff. By 1998, plaintiff had been Everen's client for several years. Prior to the January 1998 meeting with Westrope, Golber had already provided plaintiff with Home Bank's financial reports and annual report, purchased Home Bank stock for plaintiff, and solicited advice on behalf of plaintiff from Ollech. At the January 1998 meeting, Westrope suggested that they contact institutional shareholders of Home Bank stock to try to identify dissatisfied shareholders who might vote their proxies for plaintiff. Westrope agreed to make the telephone calls, and plaintiff did not instruct him not to move forward with the calls. Westrope admitted in his deposition that his intention in making the phone calls was to put plaintiff and any dissatisfied shareholders in contact with each other because these large institutional shareholders, along with plaintiff, might be able to "put some pressure on the Board or the management to make a change." The telephone calls to institutional shareholders clearly were for the purpose of advancing plaintiff's goal of obtaining control of Home Bank. Westrope made several phone calls on plaintiff's behalf. According to plaintiff, Westrope gave him investment banking advice and acted as his investment banker. These facts at least raise a question of fact regarding whether or not a principal-agent relationship existed between Westrope and plaintiff.

Without merit is defendants' alternative argument that plaintiff negated any fiduciary duty by breaching his own duty to inform defendants of vital facts regarding his fitness to run a bank. Section 435 of the Restatement (Second) of Agency provides "[u]nless otherwise agreed, it is inferred that a principal contracts to use care to inform the agent of risks of physical harm or pecuniary loss which, as the principal has reason to know, exist in the performance of authorized acts and which he has reason to know are unknown to the agent." Restatement (Second) of Agency § 435 (1958); see also *South Central Bank & Trust Co. v. Citicorp Credit Services, Inc.*, 863 F. Supp. 635 (N.D. Ill. 1994) (predicting that the Illinois Supreme Court would follow section 435). According to defendants, plaintiff subjected

them to potential pecuniary loss by failing to disclose that he paid a $15,000 fine for intentionally concealing illegal loan fees from the FDIC, that he was censured by the bank examiners, and fired by Howard Bank. As plaintiff points out, he received a letter from the FDIC in 1996 which stated that "there is no prohibition within the jurisdiction of the FDIC on your purchasing additional stock in [Howard] Bank and becoming the President and CEO." Defendants have pointed to no legal prohibition to plaintiff's obtaining controlling interest in Home Bank.

Because there is a question of fact regarding whether a principal-agent relationship existed between plaintiff and defendants, the circuit court erred in granting summary judgment in favor of defendants on count I.

## II

Plaintiff next contends that the circuit court erred in granting summary judgment in favor of defendants on counts II and IV. Specifically, plaintiff argues that there were genuine issues of fact regarding whether or not defendants were guilty of constructive fraud in connection with their usurpation of plaintiff's proposed purchase of Home Bank and whether or not the alleged fraud was a proximate cause of plaintiff's loss of the Home Bank deal.

■ Constructive fraud includes any act, statement, or omission that is construable as a fraud because of its detrimental effect upon the public interest and public or private confidence. *Stathis*, 295 Ill. App. 3d at 859. "A claim for constructive fraud does not require proof of actual dishonesty or intent to deceive; it involves the breach of a legal or equitable duty that the law declares to be fraudulent, regardless of the moral guilt of the wrongdoer, because of its tendency to deceive others." *Stathis*, 295 Ill. App. 3d at 859. Constructive fraud can arise only if there is a confidential or fiduciary relationship between the parties. *Stathis*, 295 Ill. App. 3d at 859. To recover on a constructive fraud claim, plaintiff must show that defendant (1) breached the fiduciary duty he owed to plaintiff and (2) knew of the breach and accepted the fruits of the fraud. *Stathis*, 295 Ill. App. 3d at 860.

Defendants argue that there is no evidence to show that Westrope brought the Home Bank deal to State Financial. By deposition, Falbo testified that Westrope did not suggest Home Bank as a potential candidate for acquisition by State Financial. Falbo learned of Home Bank from Hovde. Hovde testified by deposition that his company was retained by Home Bank in September 1997 to do a merger or sale of the bank. Hovde identified State Financial as a potential acquisition

candidate for Home Bank in 1997 or 1998 and initiated contact with State Financial regarding the deal in February or March 1998. The record reveals that State Financial was not on Hovde's original list of potential buyers for Home Bank. State Financial had been Westrope's client at Everen since 1996. Westrope's responsibilities included finding potential acquisitions for State Financial. State Financial had advised Westrope of its desire to expand into the Northern Illinois market. Prior to the January 1998 meeting with plaintiff, Westrope had no knowledge of Home Bank. At that meeting, plaintiff identified the Home Bank deal to Westrope, who had been engaged to look for such acquisition deals for State Financial. Westrope agreed to undertake certain actions with regard to the deal on plaintiff's behalf. Within one month after that meeting, Westrope was hired by State Financial. By June 1998, State Financial had acquired Home Bank, hired Everen to do the fairness opinion on Home Bank, and Westrope was named regional president of the former Home Bank. This time line of events raises a question of fact regarding whether or not Westrope usurped plaintiff's Home Bank deal.

Defendants further argue that even if Westrope did everything of which he is accused, plaintiff's own lack of follow-up broke any chain of causation. According to defendants, plaintiff took no meaningful action from March through June 1998 to pursue acquisition of Home Bank. Following the March 1998 meeting with Klaeser, plaintiff contacted Merrill Lynch and Dean Witter, but chose not to go to New York to follow up. Plaintiff abandoned discussions with Banco Popular when it requested more specific information about the potential deal.

■ Plaintiff must also prove that the defendant's actions proximately caused plaintiff's injury before plaintiff may recover, "even in instances of intentional torts where fiduciaries are involved." *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 59, 643 N.E.2d 734 (1994). Proximate cause generally is a fact question (*Kavales v. City of Berwyn*, 305 Ill. App. 3d 536, 712 N.E.2d 842 (1999)), but may be determined as a matter of law when the facts not only are undisputed but allow no difference in the judgment of reasonable men as to the inferences to be drawn therefrom. *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 724 N.E.2d 115 (1999).

The record shows that plaintiff was attempting to put together an acquisition group. He met with George Moser, who agreed to invest in the Home Bank deal. Nicholas Goulates, chairman of the board of American Invesco, testified by deposition that plaintiff asked him to invest in the acquisition of a bank and that he agreed to invest $3 to $5 million. Plaintiff also met with Saul Binder and, on July 2, 1998, plaintiff presented Home Bank with a letter from Success Bank ad-

dressed to plaintiff expressing an interest in pursuing acquisition of Home Bank. What constitutes reasonable action with regard to pursuing acquisition of Home Bank and a reasonable period of time for plaintiff to take such action are questions to be determined by the trier of fact.

In support of his argument that Westrope "stole" his deal and thereby caused his injuries, plaintiff mistakenly relies on Golber's deposition testimony that he was told by Ollech during a phone conversation in June 1998 that the State Financial/Home Bank deal was Westrope's deal. According to plaintiff, the circuit court erred in finding this testimony was inadmissible hearsay.

■ Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible unless it falls within one of the recognized exceptions to the rule. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 753 N.E.2d 1007 (2001). Evidence, such as hearsay, which is inadmissible at trial is not admissible in support of or in opposition to a motion for summary judgment. *Dangeles v. Muhlenfeld*, 191 Ill. App. 3d 791, 548 N.E.2d 45 (1989); 145 Ill. 2d R. 191(a).

■ Without merit is plaintiff's argument that Golber's deposition testimony was not offered for the truth of the matter asserted but, rather, to show Golber's course of conduct. The only reasonable explanation for presenting Ollech's statement to Golber is to establish that Westrope stole plaintiff's deal and brought it to State Financial. The circuit court properly refused to consider Golber's deposition testimony regarding Ollech's statement, as it was inadmissible hearsay.

Even without this hearsay testimony, however, the record reveals questions of fact regarding whether or not Westrope usurped plaintiff's Home Bank acquisition deal and whether or not defendants' fraud was a proximate cause of plaintiff's loss of the Home Bank deal. The circuit court erred in granting summary judgment in favor of defendants on counts II and IV.

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is reversed and the cause remanded for further proceedings.

Reversed and remanded.

GREIMAN and KARNEZIS, JJ., concur.