**PXRE REINSURANCE COMPANY,**
Plaintiff,

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant.**

No. 03 C 5155.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 10, 2004.

James I. Rubin, Teresa Lynn Snyder, Randi L. Ellias, Butler Rubin Saltarelli & Boyd LLP, Chicago, IL, Kenneth R. Pierce, Stephen M. Chippendale, Jeffrey S. Burman, Cadwalader, Wickersham & Taft LLP, New York City, David F. Williams, Cadwalader, Wickersham & Taft LLP, Washington, DC, for Plaintiff.

Ellen G. Robinson, Robinson, Curley & Clayton P.C., Chicago, IL, Edward P. Krugman, Sarah Penny Windle, Cahill, Gordon & Reindel, New York City, for Defendants.

### MEMORANDUM ORDER

SHADUR, Senior District Judge.

This Court's May 21, 2004 memorandum opinion and order ("Opinion") provided a reasoned explanation for its rejection of the effort by PXRE Reinsurance Company ("PXRE") to overlay its contractual relationship with Lumbermens Mutual Casualty Company ("Lumbermens") with the uberrimae fidae standard—or more precisely, to override the express limitations of the parties' contractual relationship by imposing such a superfiduciary standard. Nothing daunted, on July 29 PXRE has submitted its motion and supporting memorandum (cited "Mem.—") for reconsideration of that ruling, both (1) rehashing and repackaging the arguments that PXRE had originally proffered in support of its position and (2) voicing some variations on those arguments that it had not seen fit to advance the first time around.

That attempt to compel this Court's rethinking of an already carefully-thought-through analysis and conclusion might well be dispatched out of hand by the repetition of two quotations with which this Court has on several occasions responded to like attempts. First of those is the felicitous explanation by the late Judge Dortch Warriner in *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D.Va.1983), which describes the limited role that motions for reconsideration may properly play—a concept that has been endorsed in the same or comparable language by numerous courts other than this one, including our own Court of Appeals:

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

And the second is the statement by this Court in *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988) (as adapted to this case), which has been flatteringly cited and quoted by other courts around the country:

> Despite what [PXRE] appears to think, this Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure. Motions such as this reflect a fundamental misunderstanding of the limited appropriateness of motions for reconsideration.

■ But it is worth adding a bit to what was said in the Opinion in light of PXRE's new presentation. As PXRE's counsel would have it, uberrimae fidae plays the role of the 800 pound canary, able to sing whenever and wherever it wishes. That doctrine assertedly applies to every reinsurance relationship irrespective of its particular circumstances—irrespective of the contractual limitations that the parties may have chosen to impose in the course of entering into such a relationship. But PXRE tenders not a single authority for such a notion—for the idea that the uberrimae fidae concept operates as a powerful public policy doctrine that trumps any express boundaries with which knowledgeable and sophisticated parties may instead have elected to circumscribe their contractual relationship.

Indeed, the historical underpinnings that have been advanced by PXRE really undercut its position, when it is sought to be applied to the situation at issue here. Thus PXRE's Mem. 5–6 quotes *Sumitomo Marine & Fire Ins. Co. v. Cologne Reins. Co. of Am.*, 75 N.Y.2d 295, 552 N.Y.S.2d 891, 552 N.E.2d 139, 142 (1990) to explain why the uberrimae fidae doctrine initially developed as it did:

> In the London market—the Mecca of the reinsurance world—[reinsurance underwriting] was traditionally accomplished by the ceding [insurer] or its broker preparing a slip with brief details of the risk to be placed. . . .

By sharp contrast, not only did the transaction at issue here embrace a finite book of existing business, so that the necessary type of future reliance that typically calls uberrimae fidae into play was not involved, but the affidavit by Jeffrey Mayer ("Mayer")—attached as Ex. O to PXRE's LR 56.1 statement in opposition to Lumbermens' pending summary judgment motion—has graphically (and obviously inadvertently) torpedoed PXRE's claim of its assertedly justifiable reliance on the notion of "utmost good faith" as somehow overriding the nature of the transaction and of the parties' relationship, as embodied in their detailed written contract. This opinion attaches Paragraphs 1 through 22 of the Mayer affidavit, omitting his later rationalizations of why PXRE should assertedly not be bound by the next-quoted provision of the contract then entered into by the parties.[1]

And nothing that PXRE now argues can explain away the unambiguous language of the agreement that the parties entered into after Mayer and other PXRE representations had done their precontract work. Once again, here is Art. 11A of the parties' April 10, 2000 Aggregate Excess of Loss Retrocessional Reinsurance Agree-

---

1. Mayer's later statements include, for example, a statement of why *Lumbermens* purportedly understood what PXRE's pre-contract audit of the portfolio involved was not intended to be (Aff.¶ 23), even though his professional credentials do not include any degrees in mindreading or ESP. And Mayer's ensuing lengthy treatment of various claimed precontractual statements and representations cannot prevail over the later-stated express contractual negation of such matters, so as to alter or supersede the understandings subsequently contained in the contract itself.

ment, as already quoted (with the same added emphasis) in Opinion at 4–5:

> This Stop Loss Cover and the exhibits and schedules attached hereto constitute the entire agreement between the parties hereto relating to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the parties, and *there are no general or specific warranties, representations or other agreements by or among the parties in connection with the entering into this Stop Loss Cover or the subject matter of any of the foregoing except as specifically set forth or contemplated herein.*

Both parties were, as already stated, major players in the insurance industry (PXRE, as its corporate name indicates, in the reinsurance industry as such), armed with skilled personnel and skilled lawyers. If PXRE had really wished to qualify the unequivocal language of Art. 11A, rather than having to resort post hoc to a type of "brooding omnipresence in the sky" hedge on that unambiguous language, it would have been the simplest thing in the world for its experienced counsel to seek the insertion of limiting language appropriate to that end.[2] That would have placed the issue on the negotiating table, where it belonged, for acceptance or rejection as part of the ultimate contract. But PXRE did not do so, and this Court will not rescue it from the deal that it made (or create for it a deal that it did not make).

In sum, PXRE's motion for reconsideration is denied. Because this ruling has proceeded on the premise that the compre-

hensive contract between the parties defines their relationship, this Court should not be misunderstood as barring PXRE's argument that claimed fraud in the inducement may bar enforceability of the contract. That issue remains for resolution another day in connection with Lumbermens' pending summary judgment motion.

## EXHIBIT O

### AFFIDAVIT OF JEFFREY H. MAYER, FCAS, MAAA

I, Jeffrey H. Mayer, state as follows:

1. I am Jeffrey H. Mayer, and I make this affidavit on the basis of personal knowledge.

#### *Professional Qualifications and Career Background*

2. I received my B.A. degree, *summa cum laude*, from Brooklyn College in 1981, where I majored in Mathematics and Economics. In 1983, I completed the requirements to become, and achieved the designation of, Associate of the Casualty Actuarial Society. In 1985, I completed the requirements to become, and achieved the designation of, Fellow of the Casualty Actuarial Society ("FCAS"). In 1984, I became a member of the American Academy of Actuaries ("MAAA").

3. After working as an actuary at KPMG (then known as Peat, Marwick, Mitchell & Co.) and for a brief time at a small consulting firm, I joined the actuarial consulting firm of Milliman & Robertson ("Milliman") in January 1987. I worked at Milliman until August 1995. During my

---

**2.** As Opinion at 3 n. 1 has pointed out, the parties to the reinsurance arrangement dealt with by this Court in *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pa.*, 688 F.Supp. 386, 398 (N.D.Ill.1988) expressly provided in their contract that the PXRE counterpart there "was entitled to place its 'highest faith' in" the Lumbermens counterpart in that case, which there had the obligations of administering and reporting on the ceded policies. Nothing even hints at the notion that PXRE, whose business *is* reinsurance, was less capable of seeking just such an undertaking from Lumbermens.

time at Milliman, I became a principal, and was one of the four principals who owned and managed the property and casualty actuarial consulting practice at Milliman's New York office. At Milliman, my actuarial consulting practice included due diligence work for insurance company mergers and acquisitions, loss reserve and profitability analyses for insurance and reinsurance companies, and expert witness work on behalf of the New York Department of Insurance.

4. I left Milliman in August 1995 to join the Swiss Re Group as Principal, Chief Actuary, and Global Head of the Client Service Group, of a Swiss Re business known as Swiss Re New Markets, where I worked until April 1999. At Swiss Re New Markets, approximately 80 professionals reported to me, including lawyers, actuaries, claim experts and accountants.

5. In April 1999, I left Swiss Re to join PXRE Reinsurance Group as Executive Vice President and Head of the Alternative Risk Transfer Division. At PXRE, I was a member of the Senior Executive Management Group.

6. I left PXRE to join AIG in January 2001, where I was Senior Vice President and Chief Underwriting Officer of AIG Risk Finance. At AIG, a team of 20 professionals reported to me, and I worked on finite and loss portfolio transfer transactions with over $1 billion in premiums.

7. I left AIG in March 2003. I now devote my time to community and charitable activities and personal endeavors.

### My Role in the Retro Treaty Transaction

8. I was in charge of the business division at PXRE that investigated, underwrote, priced and bound the Retro Treaty at issue in this case. The tasks that I performed, and my role in the transaction, included the following:

9. I was the addressee of, received and reviewed the letter dated December 17, 1999 from Lumbermens' broker and agent Pegasus Advisors (the "Solicitation Letter," attached as Ex. A) [1]. The Solicitation Letter explained that Lumbermens had recently sold its Equus Re division to the company now known as Alea and that Lumbermens had retained the risk in excess of a 75% loss ratio on the business written by Equus Re prior to September 30, 1999 (designated "the Protected Portfolio" in the transaction documents). The letter solicited PXRE's interest in assuming part of the risk that the Protected Portfolio would suffer a loss ratio greater than 75%.

10. The Solicitation Letter also discussed in some detail the analysis performed by the actuarial firm Tillinghast on the Protected Portfolio, and explained the basis for Tillinghast's conclusion that the Protected Portfolio would have a 75% loss ratio.

11. I also examined the materials attached to the Solicitation Letter. In particular, I reviewed an informational package describing Equus Re's history, the biographies of key personnel, the underwriting approach and methodology used by Equus Re, and other statements which, as explained below, were material to PXRE in its analysis of the proposed transaction (the "Equus Re Presentation," attached as Ex. B).

12. The Solicitation Letter asked PXRE to submit an initial pricing quote before being allowed to "perform due diligence procedures at Equus in order to convert indications to binding quotes." (Ex. A at PXRE 003295).

---

**1.** Exhibit references are to the exhibits annexed to PXRE's Rule 56.1 Statement.

13. Both before and after receiving the Solicitation Letter, I had telephone discussions with Lawrence G. Frank, the Pegasus Vice President who had authored the Solicitation Letter and was our primary contact in connection with the solicitation and placement of the Retro Treaty.

14. After I received the Solicitation Letter, I received a copy of the actuarial study prepared by Tillinghast (the "Tillinghast Report," attached as Ex. C). I reviewed the Tillinghast Report and, in particular, noted its conclusion that the loss ratio for the Protected Portfolio would be 75%. I then turned over the Tillinghast Report to Christopher Wachter for further review. Mr. Wachter was another actuary at PXRE providing assistance on this transaction.

15. After we received the Solicitation Letter, I supervised and worked closely with PXRE employees, including Christopher Wachter, in developing initial price quotes.

16. In or around January 2000, PXRE provided these quotes, and shortly thereafter was invited to come to the offices of Alea to interview Equus Re personnel (who previously were employed by Lumbermens and who became employed by Alea after the sale of Equus Re to Alea in December 1999), and to review documents. (See Ex. D).

17. The pre-binding interviews and document review were scheduled for February 10–11 and 14–15, 2000 at Alea's offices in Norwalk, Connecticut. I organized a team of PXRE personnel to attend, including myself, Christopher Wachter, Robert Yenke, Stephen Bodnar, James Nisch, and Jose Crespo. At the pre-binding interview and document review, I both supervised the team and directly participated in interviews of former Equus Re person-

nel, including Lydia Kam, the former President and Chief Operating Officer of Equus Re.

18. I personally interviewed Lydia Kam during our visit in February 2000. As discussed further below, during the interview, Ms. Kam made specific statements and representations which reinforced the written statements contained in the Solicitation Package about Equus Re's underwriting approach and methodology. In addition, members of the PXRE team met and worked closely with other Equus Re personnel during the pre-binding interviews and document review, including Elizabeth Sander and Daniel Anelante, and reported back to me.

19. As discussed further below, we at PXRE relied upon these statements and representations in agreeing to the Retro Treaty transaction. As discussed above, I now know that these statements and representations were false and misleading at the time they were made. As I explain below, I would not have recommended to PXRE senior management and the PXRE underwriting committee that PXRE enter into the transaction if I had known that these statements and representations were false or were misleading.

20. Both during and after the pre-binding interviews and document review, I asked Mr. Wachter to develop a model for pricing the transaction. As I explain further below, Lumbermens' statements and representations regarding Equus Re's underwriting approach were essential in order for PXRE to proceed with its pricing and actuarial analysis. These representations, as discussed in more detail below, indicated to me that Equus Re underwrote each contract in the Protected Portfolio on its merits. PXRE, in turn, was able to construct its pricing model based on this fundamental and critical representation.

21. After we had developed prices that we were comfortable offering to Lumbermens, I sent the letter to Mr. Frank attached as Ex. E, offering among other options the one which was ultimately accepted by Lumbermens.

*The Scope, Purpose and Limitations of the Pre–Binding Interviews and Document Review*

22. The purpose of our on-site visit at Alea in February 2000 was to: (a) meet and interview senior Alea (former Equus Re) personnel to discuss and learn more about Equus Re's approach and methodology in connection with reinsurance underwriting; (b) to review a sampling of the underwriting and claim files in the Protected Portfolio to confirm our initial pricing; and (c) validate our understanding of the composition (by line of business) of the Protected Portfolio.