**PXRE REINSURANCE COMPANY,**
**Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY**
**COMPANY, Defendant.**

No. 03 C 5155.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 21, 2004.

---

James I. Rubin, Teresa Lynn Snider, Randi L. Ellias, Butler Rubin Saltarelli & Boyd LLP, Chicago, IL, Kenneth R. Pierce, Stephen M. Chippendale, Jeffrey S. Burman, Cadwalader, Wickersham & Taft, New York City, David F. Williams, Cadwalader, Wickersham & Taft, LLP, Washington, DC, for Plaintiff.

Ellen G. Robinson, Robinson, Curley, & Clayton, P.C., Chicago, IL, Edward P. Krugman, Sarah Penny Windle, Cahill, Gordon & Reindel, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

PXRE Reinsurance Company ("PXRE") has sued Lumbermens Mutual Casualty Company ("Lumbermens"), asserting that Lumbermens (1) made misrepresentations in the procurement of an April 10, 2000 Aggregate Excess of Loss Retrocessional Reinsurance Agreement ("Agreement") with PXRE and (2) was also negligent and reckless in the performance of its duties under the Agreement. Federal jurisdiction is based on the requisite total diversity of citizenship between the two corporations.

Lumbermens has responded with what it characterizes as a motion for summary judgment under Fed.R.Civ.P. ("Rule") 56, but this Court more properly views as a Rule 16 issue-narrowing motion.[1] Because PXRE has not presented any material issues of fact that would enable it to present a viable claim against Lumbermens on misrepresentation grounds, Lumbermens' motion is granted and the relevant claims are hereby dismissed from this action.

### Rule 56 Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to non-movants and also draw all reasonable inferences in their favor (*Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (*Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir.2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (*id.*). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). What follows is a summary of the facts, viewed of course in the light most favorable to non-movant PXRE.

### Factual Background

Both PXRE and Lumbermens are engaged in aspects of the reinsurance business (P. St.¶¶ 1–2). On December 3, 1999 Lumbermens sold all assets of its reinsur-

---

1. Essentially Lumbermens seeks in its motion to dispose of the claims based on its asserted misconduct leading up to the signing of the Agreement, while leaving for another day PXRE's claims based on asserted misconduct after the Agreement was signed. Resolution of issues as a matter of law under Rule 16 is analogous to a Rule 56(d) proceeding as to those issues (but not as to the entire case) in the summary judgment area (see 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1529, at 299–301 (2d ed.1990)). Accordingly this Court will apply familiar Rule 56 principles to frame the legal analysis, and the parties have conformed their filings to the requirements of this District Court's LR 56.1, which implements Rule 56 by requiring parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Lumbermens' LR 56.1 statement as "L. St. ¶—" and to PXRE's responding statement as "P. St. ¶—." Where Lumbermens' LR 56.1 statement is undisputed by PXRE, the opinion includes only a citation to the original statement. "L." and "P." designations are also used to refer to all other documents submitted by the parties.

ance operating division Equus Re to Alea North America Company ("Alea").[2] On the same day Lumbermens and Alea entered into a separate Aggregate Excess of Loss Retrocessional Reinsurance Agreement ("Stop Loss Cover"), under which Lumbermens reassumed risk on a specified portfolio of reinsurance contracts ("Protected Portfolio") (Compl.¶ 25).[3] Under the terms of the Stop Loss Cover, Lumbermens is responsible for losses on the Protected Portfolio that exceed a 75% paid loss ratio (*id.;* also Agreement Art. I.A).

To offset its risk under the Stop Loss Cover, Lumbermens then entered into the Agreement with PXRE on April 10, 2000. Under the Agreement PXRE reinsured Lumbermens for its first 25 loss ratio points of liabilities under the Stop Loss Cover (L. St. ¶ 22, Agreement Art. I.A).[4] In exchange, Lumbermens paid PXRE 10.375% of the underlying subject premium in the Protected Portfolio (L. St. ¶ 22, Agreement § II). Ultimately Lumbermens paid approximately $21 million to PXRE to reduce its risk exposure on the Protected Portfolio (L.St.¶¶ 22–25).

In the course of negotiating the Agreement, PXRE conducted a multiple-day due diligence audit of the Protected Portfolio (L.St.¶ 18). During the audit PXRE had access to all of Alea's files pertaining to the Protected Portfolio. No limitations were placed on the scope of its due diligence review.[5] It chose to review "approximately 80 files, representing over 70% of the premium for the portfolio to be reinsured," before entering into the Agreement (L. St. Ex. J at PXRE 005710). But its review did not encompass files associated with several contracts contained in the Protected Portfolio that it now characterizes as "loss leading" contracts. PXRE claims it did not have any reason to know that those contracts were within the package and that Lumbermens' failure to disclose them renders the Agreement susceptible to complete or partial rescission.

### Application of Rule 56 Standards
### Breach of Fiduciary Duty

PXRE originally sought to lodge claims against Lumbermens based on an asserted breach of fiduciary duty (under the label *"uberrimae fidae "*). This Court twice an-

---

2. At the time of the sale Alea was operating under the name Rhine Re Group. It rebranded itself as Alea in 2000, and it will be thus referred to throughout this opinion for the sake of simplicity (Compl.¶ 18).

3. Stop Loss Cover Art. XII (Compl. Ex. 1B at 16) defines the Protected Portfolio, which consists of most reinsurance contracts underwritten and bound by Equus Re before October 1, 1999—approximately 350 contracts (P. St.¶ 48).

4. In other words, the Agreement covers the 75% to 100% loss ratio range on the Protected Portfolio. So at the end of the day, Alea is responsible for the first 75% of the loss ratio range, PXRE for the 75% to 100% range (subject to a $50 million limit), and Lumbermens for everything beyond 100% (and also for everything over $50 million in any event).

5. In its Statement PXRE claims that it "lacks knowledge or information sufficient to form a belief to admit or deny" that all files were available for review during its due diligence audit (P. St.¶ 21). LR 56.1 is intended to distill the record presented to the court into a manageable series of clearly admitted or disputed facts. It is therefore imperative that a nonmovant's response state expressly whether it admits or disputes each numbered paragraph of the adversary's statement, supporting any disputes with record citations (LR 56.1(b)(3)(A)). Responses like PXRE's that mistakenly echo the second sentence of Rule 8(b)—which applies only to responsive pleadings—by disclaiming sufficient information to admit or deny a fact, or responses failing to cite to any record evidence to support a dispute, are simply ineffective. Any facts that are thus improperly controverted are deemed admitted (*McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir.1998)).

alyzed those claims and twice found them lacking (in *"Opinion I," PXRE Reinsurance Co. v. Lumbermens Mutual Casualty Co.,* 2004 WL 1166631 (N.D.Ill. May 21, 2004) and *"Opinion II," PXRE Reinsurance Co. v. Lumbermens Mutual Casualty Co.,* 330 F.Supp.2d 981 (N.D.Ill.2004)). Accordingly PXRE has confined its response to its fraud claims (P. Mem.2–3). Because no new information has been presented that would alter the analysis, PXRE's claims based on an asserted breach of fiduciary duty are hereby dismissed.

*Constructive Fraud*

■ As just stated, P. Mem. 2–3 acknowledges this Court's *Opinion I* at \*4 ruling that "no notions of *uberrimae fidae* or fiduciary relationship are in play as between PXRE and Lumbermens." But even though PXRE's counsel consequently purport to limit its response accordingly, in the same breath they urge PXRE's claim of constructive fraud, despite the clear teaching of Illinois law that a fiduciary relationship is a precondition to such a claim (*Prodromos v. Everen Sec., Inc.,* 341 Ill.App.3d 718, 726, 275 Ill.Dec. 671, 793 N.E.2d 151, 158 (2003)). Enough is enough (or in this case, too much). PXRE's constructive fraud claim falls flat. It must be and is dismissed.

*Negligent Misrepresentation*

■ Next PXRE seeks recovery for economic losses on a theory of negligent misrepresentation. Although the general

rule in Illinois precludes recovery in tort for economic loss (*Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982) is the seminal decision on the subject), an exception exists "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations" (*id.* at 88–89, 61 Ill.Dec. 746, 435 N.E.2d at 452).

As that quoted language reflects, that exception requires plaintiff to prove [6] "(1) the defendant is in the business of supplying information for the guidance of others in their business dealings; (2) the defendant provided information that constituted a misrepresentation; and (3) the defendant supplied the information for guidance in the plaintiff's business dealings" (*Fox Assocs., Inc. v. Robert Half Int'l, Inc.,* 334 Ill.App.3d 90, 95, 267 Ill.Dec. 800, 777 N.E.2d 603, 608 (2002)). PXRE's claim falls at the very first of those hurdles.[7]

P. Mem. 24 contends that Lumbermens should be deemed to be in the business of supplying information because the information it provided was essential to PXRE's decision to enter into the Retro Treaty. In that respect PXRE points to language from *Fox Assocs.,* 334 Ill.App.3d at 95, 777 N.E.2d at 608:

> The critical question...is whether the information is an important part of the product offered. [A] business[ ] will be deemed to be in the business of supplying information if the information fur-

---

**6.** Of course PXRE need not "prove" or "show" or "establish" anything to defeat a summary judgment motion. Instead it must merely demonstrate the existence of a material (that is, outcome-determinative) fact in dispute. Although this opinion will nonetheless often employ one of the quoted terms because the terminology is often used by the cited cases, this Court has consistently imposed that lesser burden on PXRE in testing its position.

**7.** PXRE Compl. ¶ 80 relies yet again on the notion of a "heightened duty of disclosure" in its claim of negligent misrepresentation. But it is unnecessary to address whether Lumbermens had a duty—heightened or otherwise—sufficient to meet the demands of the negligent misrepresentation claim, because the claim fails at the outset.

nished along with the non-informational goods or services is central to the business transaction.

As PXRE would have it, that quotation stands for the proposition that an entity is in the "business" of supplying information whenever it provides input that is important to the decisionmaking of another.

But any such reading misunderstands the basic thrust of the *Moorman* doctrine—it would make the limited exception swallow up the rule itself. Information is a part of nearly every commercial transaction (just look, for example, at the extensive warranties and representations set out in the typical contract covering any substantial deal), and it is plainly wrong to suggest that its presence (even its influential presence) is enough to satisfy the "in the business of supplying information" requirement. To the contrary, *Fox Assocs.*, 334 Ill.App.3d at 94, 267 Ill.Dec. 800, 777 N.E.2d at 607 itself quoted the Illinois Supreme Court's statement in *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill.2d 160, 168, 223 Ill.Dec. 424, 679 N.E.2d 1197, 1201 (1997) that the negligent misrepresentation "exception does not apply when the information supplied is merely ancillary to the sale [of a product or service] or in connection with the sale."

■ Although the "product" that was the subject of the Agreement comprised reinsurance contracts rather than tangible goods, the analysis is no different. In each instance any information about the product furnished by the seller may well find its way into the sale contract if it is viewed as sufficiently important to be encompassed in a representation or warranty, and the remedy for breach lies in con-

tract rather than tort. But it would wholly distort the *Moorman* principle to transmute such claims into the tort of negligent misrepresentation.

Just so, whatever information Lumbermens provided to PXRE in the process of negotiating and entering into the Agreement fit the description of information in connection with a sale. Whatever importance PXRE attributed to that information, it must be viewed as ancillary to the sale of the product—the Protected Portfolio. Hence the negligent misrepresentation exception is not in play here, and PXRE's claim based on that exception must also be dismissed.

*Fraud by Concealment*

PXRE has also advanced a fraud claim based essentially on a notion of concealment or nondisclosure. Despite the Complaint's repeated referrals to "misrepresentations and/or material nondisclosures" (Compl.¶¶ 68, 70, 72), a review of the allegations actually relied upon reveals that the true nature of the argument is that Lumbermens failed to proffer to PXRE, by voluntary disclosure, information regarding various contracts in the Protected Portfolio (Compl.¶¶ 41–45, 69–71).[8]

■ Under Illinois law, silence or concealment will constitute a fraud "only when the silent party had an opportunity and duty to speak" (*Manning v. Ashland Chem. Co.*, 498 F.Supp. 1382, 1383 (N.D.Ill. 1980)). And the duty to speak arises only when a fiduciary relationship is present or when "the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension"

---

**8.** Only one allegation by PXRE might be characterized as an affirmative misrepresentation: the statement in Compl. ¶ 36 that Lumbermens supplied PXRE with a Solicitation Letter in advance of contractual negotiations. But PXRE doesn't refer to that document in

its discussion of fraud by concealment—instead the Solicitation Letter is advanced only as a basis for PXRE'S claim of fraud by affirmative misrepresentation at P. Mem. 5. Consideration of that letter will therefore be reserved for later analysis.

(*Coca–Cola Co. Foods Div. v. Olmarc Packaging Co.*, 620 F.Supp. 966, 973 (N.D.Ill.1985), citing *Manning* and Illinois state court cases). Given the absence of any fiduciary duty here, PXRE's claim thus hinges on the existence of proof that (1) Lumbermens' acts contributed to its misapprehension (2) of a material fact—a misapprehension that (3) Lumbermens intentionally failed to correct.

PXRE does not assert that Lumbermens actually concealed information that contributed to some misapprehension. To the contrary, PXRE acknowledges that it had access to all of the files making up the Protected Portfolio throughout the negotiation process. Despite that access and the opportunity to define and carry out its own due diligence review, PXRE posits an affirmative obligation on Lumbermens' part to disclose information about the contents of certain contracts within the Protected Portfolio. Or to put the matter in terms of a familiar simile in the area of mandatory disclosure, PXRE is claiming that the "loss-leading contracts" within the Protected Portfolio were akin to undisclosed termites in the home that Lumbermens was trying to sell (see *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 619 (7th Cir.1989)).

■ But it is obvious that not every failure on a seller's part to volunteer information that might cause a buyer to reassess a transaction equates to undisclosed termite infestation. Instead it is necessary to consider both the nature of the transaction and the characteristics of the parties before concluding whether disclosure is or is not mandated (*Abrams v.*

*RTC*, 1992 WL 137650, at *4 (N.D.Ill. June 10, 1992)).[9]

■ At least three reasons cut against compulsory disclosure here. First, both Lumbermens and PXRE are sophisticated entities familiar with the reinsurance market—the negotiations between them fit the "arms-length" characterization admirably. Second, the very nature of their transaction required each side to engage in valuations of risk that, though complex for non-professionals, were well within their area of competence.[10] Third, those valuations were based on information fully available to both parties—PXRE not only could but did conduct its own review of the reinsurance contracts before committing itself to any contractual obligation.

PXRE complains that it did not have time to carry out a total review of the Protected Portfolio package because Lumbermens set too short a timetable for PXRE to decide whether or not to make the deal (see P. St. Ex. O ¶ 24, part of the affidavit of Jeffrey Mayer, the experienced actuary who headed up the PXRE business division and team "that investigated, underwrote, priced and bound the Retro Treaty at issue in this case" (*id.* ¶ 8). But no one held a gun to PXRE's corporate head—it was free to make the deal or pass it up as it chose. If it felt Lumbermens was giving it insufficient time to evaluate the package (remember that it was given access to the entire Protected Portfolio), all it had to do was to tell Lumbermens to go look for another buyer. It did not do so—it chose to examine the portion of the

---

**9.** To do otherwise would be to "turn every bargaining relationship into a fiduciary one" (*W.R. Grace,* 877 F.2d at 619).

**10.** As *Opinion II,* 330 F.Supp.2d at 983 explained, the situation would be quite different if the transaction had been for an unknown set of reinsurance contracts. In that case the

concept of *uberrimae fidae* might come into play and mandatory disclosure obligations might arise. But here the transaction consisted of an existing book of business—so PXRE need not have relied on Lumbermens to provide it with information regarding the component contracts of the Portfolio to which it was given unfettered access.

portfolio that it wished and to make the deal on that basis.

What PXRE now seeks to do is to shift to Lumbermens the risk that it voluntarily undertook, because hindsight has shown it did not give enough credence to some warning signs that it had been given before it entered into the Agreement (as discussed hereafter). It is in that context that this opinion emphasizes, here and hereafter, that what was involved in this instance was a free market choice by PXRE to make a deal after it had conducted the preparatory study that it chose to make in the business climate in which it was operating.

Under all of the circumstances, then, Lumbermens had no obligation to inform PXRE of the specific characteristics of any contracts contained in the Protected Portfolio. And that in turn means PXRE cannot claim that its asserted misapprehensions were due to any concealment or failure to disclose on the part of Lumbermens. If it is disappointed in the deal that it made, that must be viewed as a self-inflicted wound—the result of the nature and scope of the due diligence review that it chose to make (something more will be said on that subject later as well). So PXRE's fraud argument, to the extent it is sought to be based on any notion of Lumbermens' affirmative obligation to reveal certain information, also fails as a matter of law.

*Fraud by Affirmative Misrepresentation*

■ PXRE's next claim advances the more traditional fraud argument that Lumbermens made false and misleading statements of material fact on which PXRE reasonably relied when deciding to enter into the Agreement (P. Mem.3–4). In that respect PXRE must prove (1) that Lumbermens made false statements of material fact (2) knowing that they were false and (3) intending that PXRE would rely on them; (4) that PXRE did rely; (5)

that such reliance was justified; and (6) that PXRE suffered damage as a result (*General Motors Acceptance Corp. v. Central Nat'l Bank*, 773 F.2d 771, 778 (7th Cir.1985) (hereafter cited "*GMAC*"); *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599, 601 (1980)).

As for the first requirement, PXRE points particularly to three written documents:

1. a Solicitation Letter to PXRE from the Vice President of a reinsurance intermediary retained by Lumbermens to obtain retrocessional protection on the Protected Portfolio (P. St.¶¶ 15–16, P. St.Ex. A);

2. an overview of Equus Re attached as a supporting document to the Solicitation Letter (P. St.Ex. B); and

3. the Tillinghast Report, an actuarial study prepared by Tillinghast–Towers Perrin and provided to PXRE by Lumbermens (P. St.Ex. C).

PXRE also cites numerous oral representations made by individuals representing Lumbermens that reinforced the written representations (P. Mem.5, 7).

■ In that context PXRE argues that Lumbermens' nondisclosure of details relating to certain contracts takes on a different light. PXRE's contention is that the nondisclosure, when taken together with statements by Lumbermens, is misleading and can form the basis of a fraud claim. PXRE is generally correct: Material omissions coupled with affirmative statements are treated differently than omissions standing alone, and even true statements can be deemed fraudulent when made without necessary qualifying material (*GMAC*, 773 F.2d at 778; *Perlman v. Time, Inc.*, 64 Ill.App.3d 190, 195, 20 Ill.Dec. 831, 380 N.E.2d 1040, 1044 (1978)).

■ But that does not assure clear skies for PXRE's fraud claim, for a particularly dark cloud looms on the horizon. Even if the statements that PXRE has identified were to be considered both false and material,[11] PXRE has not shown that it actually relied on them—and even if it had done so, there is no evidence that any such reliance would have been justified.

Those considerations will be addressed in reverse order because of the way they link up in this case. As to that second requirement, PXRE "must set forth enough facts from which a jury could find by clear and convincing evidence that it was justified in relying on the defendants' alleged misrepresentation" (*Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir.1988)). And to analyze whether such facts have been tendered, the Illinois courts have instructed that it is appropriate to consider a variety of factors (*Luciani v. Bestor*, 106 Ill. App.3d 878, 884, 62 Ill.Dec. 501, 436 N.E.2d 251, 256 (1982), quoted and relied on by our Court of Appeals in *Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1058 (7th Cir.1988)):

> In determining whether a party justifiably relies on another's representations, all of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration. Only where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the others' representations. The plaintiffs herein were experienced business persons.... There was ample opportunity for the plaintiffs to conduct their own investigation.... Apparently they chose not to do so. On these facts we do not hesitate to affirm the finding by the trial judge that no actionable fraud could be found.

That statement of principle, and the conclusion reached there, could well have been written for this case. It is an understatement to say that PXRE is a sophisticated party: Its very corporate name tells us that reinsurance—the subject matter of the Agreement—*is* its business. It is totally unpersuasive for it to assert it reasonably relied on such things as the bullet point statements that it now identifies in the Equus Re brochure, which includes such bland assurances as "discipline, controlled· underwriting" and "profitability" (P. St. Ex. B at LMCC 2179, 2183)(see *Indemnified Capital Invs., S.A. v. R.J. O'Brien & Assocs., Inc.*, 12 F.3d 1406, 1413 (7th Cir.1993)).

To be sure, Lumbermens had greater knowledge of the Protected Portfolio's component contracts, but that does not—under the circumstances here—mean that PXRE was justified in relying on any gen-

---

11. Lumbermens argues that the statements should not be considered false because PXRE could identify only six problematic contracts out of the 350–contract package and because those contracts represented a very small amount of the total premiums covered by the Agreements (L.R. Mem.6–9). PXRE responds in two ways in its Surr. Mem. 1–2:

1. There could be many more problematic contracts that would be revealed by continued discovery.

2. It focuses on the losses rather than the premiums associated with the contracts in question, and it submits affidavits that declare that PXRE would not have entered into the Agreement had it been aware of those contracts.

But it is unnecessary to resolve those disputes, for the plain absence of justifiable reliance torpedoes the fraud claim in all events.

eral representations as to those contracts made by Lumbermens. Transactions almost always begin with asymmetry of information, but that does not eliminate the need for the less-informed party to exercise ordinary prudence. And in this situation that leads the analysis back to the first element: whether there was actual reliance on PXRE's part to begin with.

Here the record indisputably provides a negative answer, for PXRE *did* conduct its own investigation *before* entering into the deal—and as already stated it had, and exercised, total control over the scope of that investigation. In doing so it obtained information that cast doubt on the selfsame statements upon which it now attempts to hang its reliance argument.

For example, PXRE suggests that its reliance on various Lumbermens statements—and especially on the Tillinghast Report—created a "misapprehension that Equus Re employed a 'full pricing,' actuarial-driven underwriting methodology to price risks on their own merit" (P. Mem.13). But PXRE's own due diligence report, generated as the product of an investigation that it was given a full opportunity to conduct before it entered into the transaction, totally undercuts its current position. In explaining why that due diligence review was undertaken at all, the report to PXRE noted (L. St. Ex. J at PXRE 005710):

> The underwriting team of Equus Re was largely drawn from former employees of TIG Re..., and the historical results of TIG's reinsurance book were unprofitable. A report prepared by Tillinghast suggesting an expected loss ratio on the Equus book of business of 75% appeared quite optimistic in this light; and so full scale due diligence was deemed appropriate.

And in fact the report ultimately estimated a loss ratio of 88.5% (*id.* at PXRE 005712).

Furthermore, the due diligence report concluded with respect to underwriting methodology (*id.* at 005709, 005711):

> Actuarial review summaries appeared in the larger account files. In many...cases, however, the review was completed after the effective date of the contract, and as such did not factor into the initial decision....In many cases, particularly on the larger casualty accounts, our estimate of ultimate loss was higher than that of Equus or of Tillinghast. In a number of instances, the actuarial pricing analysis used optimistic "as if" assumptions....Even where Equus was the titular lead on an account, there is no evidence that they negotiated prices or terms of a contract. It would be fair to assume that Equus was in effect a following market for most, if not all, of their portfolio.

Finally, that report specifically questioned the statements made by Equus Re employees Elizabeth Sander and Lydia Kam. As to Kam, the report flatly stated that "[m]uch of what she said was not consistent with our review of the underwriting files, or misleading in other ways" (*id.* at PXRE 005710). And although the report characterized the discussions with Sander as "useful," it went on to conclude that "we disagree" with her statements regarding expected loss ratio on the Protected Portfolio.

In sum, all of those aspects of PXRE's self-undertaken due diligence review—exactly the kind of precautionary conduct that such a knowledgeable party could be expected to undertake before committing itself to such a major transaction—negate PXRE's effort to say at this point that it relied on some statements that were not credited at the time of its own pre-Agreement review. In an effort to salvage its position in the face of that adverse evidence, PXRE now submits a portion of the

Jeffrey Mayer affidavit declaring that Lumbermens' statements "were material to PXRE and PXRE relied upon them, as well as its review of a sampling of the Protected Portfolio documents, in binding the Retro Treaty" (P. St. Ex. O ¶ 25). But that conclusory statement, which couples purported reliance on Lumbermens' statements with reliance on the results of PXRE's due diligence review headed up by the affiant, is really not entitled to be credited in view of the evaluative process discussed in factual detail in the same affidavit. And if it did have to be viewed as posing a material factual issue, we come full circle to the unjustifiability of any such purported reliance, as already discussed here.

In the end, nothing has been presented to change this Court's earlier finding that PXRE "reached its own conclusions as to the evaluation of the risks in taking on the retrocession" (Opinion I at *3). And in this regard the situation here echoes the one described by the Illinois Supreme Court four decades ago in *Eisenberg v. Goldstein*, 29 Ill.2d 617, 621, 195 N.E.2d 184, 186 (1963):

> In the case at bar the evidence is undisputed that the plaintiffs inspected the property for themselves. It is quite clear that in making the exchange they relied upon their own judgment, based on such examination, and not upon representations made by the defendants. Under such circumstances no fraud was practiced upon the plaintiffs of which they can complain, even though the examination made by them may have been inadequate, so as to lead to mistaken conclusions.

### Conclusion

PXRE's claims based on breach of a purported fiduciary duty must be dismissed in light of this Court's conclusion that "no notions of *uberrimae fidae* or fiduciary relationship are in play as between PXRE and Lumbermens" (*Opinion I* at *4). And PXRE's constructive fraud claim fails for the same reason.

There can also be no sustainable claim based on negligent misrepresentation, in that respect because Lumbermens cannot be said to be in the business of supplying information. Next, to the extent that the fraud claim is based on a theory of concealment, it must be dismissed because Lumbermens was under no duty of mandatory disclosure as to the specific contents of the component contracts making up the Protected Portfolio. Finally, the more traditional fraud claim based on misrepresentations of material fact also loses, in this instance because PXRE has not shown and cannot show justifiable reliance on Lumbermens' statements. And because PXRE's request for further discovery could not serve to bring the dead to life, there is no need to delay the inevitable—that claim is also dismissed.

In sum, Lumbermens' Rule 16 motion is granted in its entirety. Of course, this conclusion does not dispose of the entire case. PXRE's claims based on breach of contract associated with claims handling remain for resolution another day. To that end a status hearing is set for 9 a.m. November 1, 2004 to discuss further proceedings in the case.